UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 26-57158-JWC |
| | ) | |
| CURTIS WALTER HINTON, JR., | ) | CHAPTER 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| S. GREGORY HAYS, as Chapter 7 trustee, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | CONTESTED MATTER |
| | ) | |
| FARMERS AND MERCHANTS BANK, UNITED AUTO ACCEPTANCE CORP., DANCO FINANCIAL, AICA ORTHOPEDICS PC, GEORGIA DEPARTMENT OF REVENUE, UNITED STATES OF AMERICA (INTERNAL REVENUE SERVICE), HENRY COUNTY TAX COMMISSIONER, and CURTIS WALTER HINTON, JR., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

**TRUSTEE'S MOTION FOR AUTHORITY TO (A) SELL PROPERTY OF THE BANKRUPTCY ESTATE FREE AND CLEAR OF ALL LIENS, INTERESTS, AND ENCUMBRANCES; (B) DISBURSE CERTAIN PROCEEDS AT CLOSING; AND (C) SURCHARGE COLLATERAL OF GEORGIA DEPARTMENT OF REVENUE, UNITED AUTO ACCEPTANCE CORP., AND DANCO FINANCIAL**

COMES NOW S. Gregory Hays, as Chapter 7 Trustee ("**Trustee**" or "**Applicant**") for the bankruptcy estate (the "**Bankruptcy Estate**") of Curtis Walter Hinton, Jr. ("**Debtor**"), pursuant to 11 U.S.C. §§ 105(a), 363(b), (f), and (m), 506(c), and 522(k)(1) and Fed. R. Bankr. P. 2002(a)(2), 6004(a), 6004(c) and 9014, through undersigned counsel, and files *Trustee's Motion for Authority to (A) Sell Property of the Bankruptcy Estate Free and Clear of All Liens, Interests, and*

*Encumbrances; (B) Disburse Certain Proceeds at Closing; and (C) Surcharge Collateral of Georgia Department of Revenue, United Auto Acceptance Corp., and Danco Financial* (the "**Sale Motion**"), respectfully showing:

**Venue and Jurisdiction**

1. This Court has jurisdiction over this Sale Motion under 28 U.S.C. §§ 157 and 1334. Venue of this case in this District is proper under 28 U.S.C. §§ 1408 and 1409. This Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2).

**Background**

***a. General Background***

2. Debtor initiated the underlying bankruptcy case (the "**Case**" or "**Bankruptcy Case**") by filing a voluntary petition for relief under Chapter 13 of Title 11 of the United States Code (the "**Bankruptcy Code**") on June 1, 2026 (the "**Petition Date**") [Doc. No. 1].

3. On June 29, 2026, Debtor requested conversion of the Case to a case under Chapter 7 of the Bankruptcy Code [Doc. No. 18], and the Case was converted to a case under Chapter 7 on June 30, 2026.

4. Trustee was thereafter appointed the duly acting Chapter 7 trustee in the Case under 11 U.S.C. § 701(a)(1), and he remains in this role.

5. At the commencement of the Case, the Bankruptcy Estate was created under 11 U.S.C. § 541(a), and it includes all Debtor's legal or equitable interests in property as of the commencement of the Case and any interest in property that the Bankruptcy Estate acquires after commencement of the Case. 11 U.S.C. §§ 541(a)(1) and (7).

6. Trustee is the sole representative of the Bankruptcy Estate. 11 U.S.C. § 323(a).

7. The duties of Trustee include his obligation to "collect and reduce to money the

property of the estate . . . ." 11 U.S.C. § 704.

8. This is Debtor's second bankruptcy case of 2026. Debtor filed a prior case under Chapter 13 of the Bankruptcy Code on January 22, 2026, Case No. 26-50902 (the "**First Case**"), which was dismissed on April 8, 2026 for failure to make plan payments.

9. On September 3, 2026, Debtor filed a motion to dismiss the Case [Doc. No. 28], which Debtor amended on September 16, 2026 [Doc. No. 33] (together, the "**Motion to Dismiss**"). Trustee opposed the Motion to Dismiss [Doc. Nos. 32 and 42]. On September 24, 2026, Debtor withdrew the Motion to Dismiss [Doc. No. 43].

***b. The Property***

10. On the Petition Date, Debtor filed his schedules of assets and liabilities [Doc. No. 1] (the "**Schedules**") together with his Statement of Financial Affairs (the "**SOFA**").

11. On his Schedule A/B, Debtor listed ownership interest in real property located at 209 Kingscastle Drive, Ellenwood, Georgia 30294, located in Henry County, Georgia (the "**Property**"), with a value of $725,000.00 [Doc. No. 1]. The Property is more particularly described as Lot 3, Kingsbrook Subdivision, Land Lot 223 of the 12th District, Henry County, Georgia, according to the plat recorded at Plat Book 44, Page 173, Henry County, Georgia records (Tax Parcel I.D. No. 044H01003000).

12. Upon information and belief, Debtor acquired the Property on or about December 21, 2020 for a purchase price of $400,000.00.

***c. Alleged Liens, Interests and Encumbrances on or against the Property***

13. On his Schedule D: Creditors Who Have Claims Secured by Property, Debtor listed a single creditor with a security interest in the Property: Farmers and Merchants Bank ("**F&M Bank**"), with a claim of $337,601.00 [Doc. No. 1].

14. On August 28, 2026, Debtor filed an Amended Schedule C claiming a homestead exemption of $21,500.00 in the Property [Doc. No. 25] (the "**Claimed Exemption**").

15. Trustee has reviewed the real estate records (the "**Real Estate Records**") and general execution docket (the "**General Execution Docket**" and with the Real Estate Records, the "**Henry County Lien Records**") for the Superior Court of Henry County, which reflect that the Property is encumbered by a security deed in favor of F&M Bank dated December 21, 2020, recorded at Deed Book 17716, Pages 163-173 of the Real Estate Records. F&M Bank has filed a secured claim (No. 5-1) in the amount of $376,130.22, and it has filed a motion for relief from the automatic stay of Section 362 of the Bankruptcy Code to foreclose its interest in the Property [Doc. No. 17] (the "**Stay Motion**"). To date, the Court has not ruled on the Stay Motion.

***d. Other Liens against the Property***

16. The Henry County Lien Records also reflect that other Respondents named above have claimed liens on the Property as follows, in order of recording:

| | | |
|---|---|---|
| United Auto Acceptance Corp. | $35,402.96 | Fi. fa. recorded April 19, 2022 Book 1662, Page 120-121 |
| Georgia Dept. of Revenue | $64,295.76 (face amount) | Execution recorded July 18, 2022, Book 1681, Page 180 |
| Danco Financial | $4,524.04 | Fi. fa. recorded May 6, 2024 Book 1794, Page 20-21 |
| AICA Orthopedics McDonough | $16,611.31 | Fi. fa. recorded March 31, 2026 Book 1937, Page 264 |
| Georgia Dept. of Revenue | $6,529.44 | Execution recorded April 17, 2026, Book 1941, Page 131 |
| Georgia Dept. of Revenue | $5,850.82 | Execution recorded April 17, 2026, Book 1941, Page 134 |
| Georgia Dept. of Revenue | $3,397.83 | Execution recorded April 17, 2026, Book 1941, Page 137 |

17. The state tax execution recorded July 18, 2022 (Execution No. REV 220993620) covers tax years 2014, 2015, 2018, and 2019. The three state tax executions recorded April 17,

2026 (Execution Nos. REV 241930221, REV 241691960, and REV 241745505) cover tax years 2017, 2022, and 2021, respectively.

18. The Henry County Lien Records reflect no other liens, interests, or encumbrances on or against the Property, other than *ad valorem* real property taxes owed to Henry County.

19. In addition, the Internal Revenue Service (the "**IRS**") has filed a Notice of Federal Tax Lien, IRS Form 668(Y)(c), Serial No. 540313126, dated May 5, 2026, which was recorded on May 13, 2026 in the records of the Clerk of Superior Court of Clayton County, Georgia, and which identifies unpaid assessments for tax years 2014, 2015, 2016, 2017, 2018, 2019, 2021, and 2022 totaling $326,817.21 (the "**IRS Lien**"). The Property is not located in Clayton County, Georgia, and the Notice of Federal Tax Lien has not been recorded in the Henry County Lien Records.

20. Three of the liens described above were recorded within the ninety (90) days preceding the Petition Date (the "**Preference Period**"): (a) the writ of fieri facias in favor of AICA Orthopedics McDonough ("**AICA**") recorded March 31, 2026 (the "**AICA Lien**"); (b) the three state tax executions in favor of the Georgia Department of Revenue ("**GDOR**") recorded April 17, 2026 for tax years 2017, 2021, and 2022 (the "**2026 GDOR Liens**"); and (c) the IRS Lien (together with the AICA Lien and the 2026 GDOR Liens, the "**Disputed Liens**"). The 2026 GDOR Liens and the IRS Lien were each recorded after the dismissal of the First Case on April 8, 2026 and before the filing of this Case on June 1, 2026.

21. United Auto Acceptance Corp. ("**UAA**") has filed a secured claim (No. 1-1) in the amount of $35,402.96. The original amount of the underlying judgment, through which the UAA claim is secured, was $15,275.01, and, upon information and belief, UAA seeks over $20,000.00 of interest.

22. GDOR has filed a claim (No. 2-1) in the amount of $50,146.20, of which

$44,616.10 is asserted as secured and $5,530.10 is asserted as priority. Of the secured amount, $32,071.65 is attributable to tax years 2014, 2015, and 2018, which are the subject of the state tax execution recorded July 18, 2022 (the "**2022 GDOR Lien**"), and the balance is attributable to tax years 2017, 2021, and 2022, which are the subject of the 2026 GDOR Liens.[1]

23. Notably, in the First Case, GDOR filed a claim (No. 5-1) on February 3, 2026, in which it asserted a secured claim only as to tax years 2014, 2015, and 2018, and classified its claims for tax years 2017, 2021, and 2022 as priority or general unsecured claims. Likewise, the IRS filed a claim (No. 7-1) in the First Case on February 19, 2026, in the amount of $606,531.20, no portion of which was asserted as secured.

24. In this Case, the IRS has filed a claim (No. 12-1) in the amount of $570,502.74, of which $396,899.00 is asserted as secured and $41,873.09 is asserted as priority. The secured portion of the IRS's claim is based solely upon the IRS Lien.

25. Neither Danco Financial ("**Danco**") nor AICA has filed a claim in the Case.

***e. Employment of Broker and Marketing of Property***

26. On October 9, 2026, Trustee filed his Application to Employ Real Estate Agent Under Listing Agreement [Doc. No. 45], seeking authority to employ Lakisha Knight and Keller Williams West Atlanta (collectively, the "**Broker**") as the listing agent for the Bankruptcy Estate, at a starting list price of $564,000.00 (the "**List Price**") with a six percent (5%) commission of the sale price.

---

[1] The 2026 GDOR Liens reflect face amounts totaling $15,778.09. GDOR's Claim No. 2-1 attributes $18,074.55 to tax years 2017, 2021, and 2022, inclusive of the $5,530.10 that GDOR asserts as a priority claim for tax year 2022. Claim No. 2-1 does not assert any amount on account of tax year 2019.

27. The Purchaser (defined below) is represented by Gloria Watson of Gloria A. Watson Realty (the "**Buyer's Broker**"), and under the Contract (defined below), the Buyer's Broker is to receive two percent (2%) of the sale price as a share of the Broker's commission.

***f. Filed Claims Against the Bankruptcy Estate***

28. The total of the filed claims against the Bankruptcy Estate is $1,040,959.95, of which $853,048.28 is asserted as secured and $47,403.19 is asserted as priority, including the secured claims of F&M Bank, UAA, GDOR, and the IRS described above. The deadline for non-governmental creditors to file proofs of claim is December 16, 2026 [Doc. No. 36], and the deadline for governmental units to file proofs of claim is December 28, 2026.

**Request for Authority to Sell Property of the Estate**
**Free and Clear of all Liens, Interests, and Encumbrances**
**Pursuant to 11 U.S.C. §§ 363(b) and (f)**

29. Trustee entered into a Purchase and Sale Agreement with an Offer Date of September 29, 2026 and a Binding Agreement Date of October 8, 2026, for the sale of the Property to LaQuantis A. Hall (the "**Purchaser**"), "as is, where is," for a sale price of $564,000.00 (the "**Purchase Price**"), subject to Bankruptcy Court approval (the "**Contract**"). A true and correct copy of the Contract, including all exhibits and special stipulations thereto, is attached hereto and incorporated herein by reference as Exhibit "A."

30. The material terms of the Contract include the following:[2] (a) the Property is sold "as is, where is," without representations or warranties, and Trustee will convey the Bankruptcy Estate's interest in the Property by trustee's deed; (b) Trustee has no obligation to close until the entry of an order of this Court approving the sale and such order becoming a final order, and the

---

[2] This summary is provided for the convenience of the Court and parties in interest. To the extent of any conflict between this summary and the Contract, the Contract controls.

Contract terminates if the Court denies approval or fails to issue such an order; (c) the Contract is subject to higher and better offers; (d) the Contract is contingent upon the Purchaser obtaining conventional mortgage financing and is subject to an appraisal contingency; (e) at Closing, the seller will make a monetary contribution toward the Purchaser's closing costs of three percent (3%) of the Purchase Price, or $16,920.00 (the "**Seller Contribution**"), and will provide a termite clearance letter and a home warranty (at a cost of approximately $700.00); (f) Lueder, Larkin & Hunter, LLC (the "**Closing Attorney**") will serve as closing attorney and as holder of the earnest money; and (g) the sole remedy of each party for an uncured material default by the other is termination of the Contract and retention or return, as applicable, of the earnest money.

31. The Contract also includes a Temporary Occupancy Agreement for Buyer Prior to Closing (Exhibit "E" to the Contract) (the "**Occupancy Agreement**") and an amendment authorizing the Purchaser to make repairs or improvements prior to Closing (Amendment #1 to the Contract). Under the Occupancy Agreement, the Purchaser may occupy the Property prior to Closing in exchange for a flat fee of $1,000.00 for possession through November 4, 2026, which is payable to Trustee and not to Debtor or any other person. The Purchaser's occupancy of the Property prior to Closing is at the Purchaser's sole risk, and Trustee has no obligation to reimburse or compensate the Purchaser for any repairs, alterations, or improvements if the Court does not approve the sale. To the extent required, Trustee requests approval of the Occupancy Agreement and Amendment #1 under 11 U.S.C. § 363(b).[3]

---

[3] Of the utmost importance, without Court authority or Trustee's approval, Debtor had already contracted to sell the Property to Purchaser (without telling her he was in bankruptcy) and also agreed to let her move into the Property. Trustee is seeking approval of the principal terms of the underlying sale agreement and occupancy agreement to avoid harming the Purchaser, as much as possible.

32. The Purchaser was procured through the efforts of Trustee and his Broker, is a bona fide purchaser, and is not an insider of Debtor, Trustee, or the Broker. The Purchaser has submitted an earnest money deposit in the amount of $5,000.00, which is held by the Closing Attorney.

33. Trustee's proposed Contract for a Purchase Price of $564,000.00 is: (a) the highest and best offer that Trustee has received; and (b) an appropriate selling price for the Property. Because the Contract is subject to higher and better offers, Trustee will consider any higher or better offer received prior to the hearing on this Sale Motion.

34. Subject to Bankruptcy Court approval, the closing of the sale of the Property is currently scheduled for November 6, 2026 (the "**Closing**").

35. Trustee respectfully requests authority from the Court to sell the Property to Purchaser for a sale price of $564,000.00 with a 3% seller's credit.

**Request for Authority to Surcharge Collateral and Legal Analysis Regarding Same**

36. As mentioned above, on June 11, 2026, F&M Bank filed its Stay Motion [Doc. No. 17] requesting relief from the automatic stay to exercise its rights under its security deed, including to foreclose its interest in the Property. On the same date, F&M Bank also objected to confirmation of Debtor's Chapter 13 plan [Doc. No. 16].

37. If stay relief were to be granted, F&M Bank could foreclose its interest in the Property by a non-judicial sale under the power of sale in its security deed. *See* O.C.G.A. § 44-14-160 *et seq*. A foreclosure sale by F&M Bank would extinguish the junior liens of GDOR (as to the 2022 GDOR Lien), UAA, and Danco (the "**Lienholders**") as liens on the Property, and the Lienholders could look only to any surplus remaining after full satisfaction of F&M Bank's secured debt, together with accrued interest, attorney's fees, and the costs of the foreclosure.

38. Upon information and belief, absent a sale by Trustee, the Lienholders, and in

particular the judgment lien creditors UAA and Danco, would likely receive nothing through a state law foreclosure sale conducted by F&M Bank.

39. Even if a surplus were generated, the Lienholders would bear the delay and expense of asserting their claims to that surplus.

40. By contrast, if Trustee's Sale Motion is approved and the sale of the Property closes, the Property will have been marketed and sold on the open market for $564,000.00, and each of the Lienholders will be paid in cash at Closing, net only of the surcharges requested herein. The proposed sale will therefore provide a benefit to the Lienholders that they would not likely realize through a foreclosure by F&M Bank.

41. Section 506(c) of the Bankruptcy Code permits a trustee to recover administrative expenses from a secured creditor's collateral if three conditions are satisfied: (i) the expenses are "necessary" to preserve or dispose of the collateral, (ii) they are "reasonable," and (iii) the incurrence of the expenses provided a "benefit" to the secured creditor. *See, e.g.*, *Federal Land Bank v. Belew (In re Belew)*, 44 B.R. 12 (Bankr. N.D. Ala. 1984) (explaining trustee must show that if not for the trustee's involvement and expenditures, the secured creditor would not have received as much of its claim as was realized; compare with likely results of hypothetical foreclosure by secured creditor); *Peninsula Fed. Sav. & Loan Ass'n v. Moore (In re Roggio)*, 49 B.R. 450, 453 (Bankr. D. Conn. 1985) (explaining party must show that secured creditor would not have realized the full satisfaction of its claim without the intervention of the trustee).

42. Here, the broker's commission resulting from the proposed Sale will be $28,200.00 (or 5% of $564,000.00). Trustee requests that the Lienholders' collateral (the Property) be charged with the expenses of the sale of the Property, namely a portion of the broker's commission. More specifically, Trustee requests that Trustee be allowed to make the following distribution from the

sale proceeds of the Property and to surcharge the lien interests of the following secured creditors in the specified amounts:

| CREDITOR | LIEN AMOUNT OR SECURED CLAIM AMOUNT | AMOUNT TO BE PAID FROM SALE PROCEEDS | AMOUNT TO BE SURCHARGED[4] |
|---|---|---|---|
| Georgia Dept. of Revenue (2022 GDOR Lien) | $32,071.65 (secured claim amount attributable to 2022 GDOR Lien) | $27,071.65 | $5,000.00 |
| United Auto Acceptance Corp. | $35,402.96 | $30,402.96 | $5,000.00 |
| Danco Financial | $4,524.04 | $2,024.04 | $2,500.00 |

43. Trustee reserves the right to surcharge these purported lien holders in greater amounts, depending on how much they assert they are owed at or prior to closing.

**Reservation of Right to Surcharge Debtor's Claimed Exemption Pursuant to 11 U.S.C. § 522(k)(1)**

44. As set forth above, Debtor has claimed a homestead exemption of $21,500.00 in the Property.

45. Trustee reserves all rights with respect to the Claimed Exemption, and nothing in this Sale Motion is a concession that the Claimed Exemption is allowable in any particular amount, and in particular, Trustee reserves the rights to surcharge Debtor's Claimed Exemption under Section 522(k)(1), if Trustee is successful in avoiding the liens of the IRS and the GDOR.

**Legal Analysis Regarding Sale**

***a. Sale Free and Clear***

46. Section 363 of the Bankruptcy Code authorizes a trustee "after notice and a hearing

[4] The total amount proposed to be surcharged is $12,500.00. This is less than one-half of the $28,200.00 of real estate commission that will result from the proposed sale.

. . . [to] use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Section 105 of the Bankruptcy Code grants this Court the authority to "issue any order, process, or judgment necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

47. The standard to grant a sale of property outside of the ordinary course of business is the sound business judgment of the trustee. *In re Chateaugay*, 973 F.2d 141 (2d Cir. 1992); *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). In this regard, a trustee's showing need not be exhaustive; rather, a trustee is "simply required to justify the proposed disposition with sound business reason." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984)

48. In turn, Section 363(f) of the Bankruptcy Code authorizes a trustee to sell property under 11 U.S.C. § 363(b) free and clear of any interest in the subject property if, among other things, the entity holding such interest could be compelled to accept a money satisfaction of such interest, or if such interest is the subject of a bona fide dispute. 11 U.S.C. § 363(f). Specifically, that code section provides:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if-
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*Id.*

49. As set forth above and below, Trustee can, under 11 U.S.C. § 363(f), sell the Property free and clear of all liens, claims, interests, and encumbrances with any lien (to the extent valid, perfected, enforceable, and unavoidable) attaching to the proceeds of the sale with the same priority and extent as it had in the Property.

50. More particularly, the liens of F&M Bank, the Lienholders, and Henry County will be paid from the sale proceeds at Closing (in the case of the Lienholders, net of the surcharges requested above). Each such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest, and Trustee may sell free and clear of those interests under 11 U.S.C. § 363(f)(5), and, to the extent such entities consent to or do not object to the Sale Motion, under 11 U.S.C. § 363(f)(2).

51. Regarding the Disputed Liens, Section 363(f)(4) permits a sale free and clear of an interest that is "in bona fide dispute." 11 U.S.C. § 363(f)(4). Courts apply an objective standard, asking whether there is an objective basis for either a factual or a legal dispute as to the validity of the interest; the court need not resolve the dispute to authorize the sale. *See, e.g.*, *In re Collins*, 180 B.R. 447, 452 (Bankr. E.D. Va. 1995).

52. The IRS Lien is the subject of a bona fide dispute. Under 26 U.S.C. § 6323(a), a federal tax lien is not valid as against a purchaser until notice of the lien has been filed in the place prescribed by 26 U.S.C. § 6323(f), which, for real property, is the office designated by the law of the State in which the property is situated. 26 U.S.C. § 6323(f)(1)(A)(i). Georgia law designates the office of the clerk of the superior court of the county in which the real property is located. *See* O.C.G.A. § 44-14-571. Upon information and belief, the IRS Lien was recorded only in Clayton County, and the Property is not located in Clayton County. Accordingly, the IRS Lien was not perfected or enforceable against a bona fide purchaser of the Property at the commencement of the

Case, and Trustee contends that it is avoidable under 11 U.S.C. §§ 544(a)(3). Independently, the IRS Lien was recorded within the Preference Period on account of tax liabilities assessed between 2019 and 2023, and Trustee contends that it is avoidable under 11 U.S.C. § 547(b).

53. The 2026 GDOR Liens are likewise the subject of a bona fide dispute. Although the underlying executions were issued in 2024, they were not recorded until April 17, 2026, within the Preference Period and after the dismissal of the First Case, on account of tax liabilities for tax years 2017, 2021, and 2022. The recording of the 2026 GDOR Liens was a transfer of an interest of Debtor in property, to or for the benefit of a creditor, on account of an antecedent debt, made while Debtor is presumed to have been insolvent, 11 U.S.C. § 547(f), within ninety days before the Petition Date, that enables GDOR to receive more than it would receive in a Chapter 7 case had the transfer not been made. *See* 11 U.S.C. §§ 547(b) and (e). Indeed, in the First Case, GDOR itself classified its claims for those tax years as priority or general unsecured claims.

54. The AICA Lien is likewise the subject of a bona fide dispute. The AICA Lien relates to a (notably) unscheduled personal injury claim of the Debtor and is not a lien on the Property, at all. Alternatively, the AICA Lien was recorded on March 31, 2026, within the Preference Period, on account of an antecedent debt, and Trustee contends that it is avoidable under 11 U.S.C. § 547(b).

55. Trustee intends to commence an adversary proceeding to avoid the Disputed Liens and to preserve them for the benefit of the Bankruptcy Estate under 11 U.S.C. § 551. This Sale Motion does not seek a determination of the validity, priority, or extent of the Disputed Liens. Rather, Trustee requests authority to sell the Property free and clear of the Disputed Liens under 11 U.S.C. § 363(f)(4), with the Disputed Liens, to the extent valid, perfected, enforceable, and unavoidable, attaching to the net proceeds of the sale held by Trustee with the same priority and

extent as they had in the Property, pending further order of the Court.

56. Notably, the proposed sale of the Property is not in the ordinary course of business, as allowed by 11 U.S.C. § 363(b). Any lien to the extent valid, perfected, enforceable and unavoidable will attach to the proceeds of the sale as provided by 11 U.S.C. § 363(f).

***b. Good Faith of Trustee and Purchaser***

57. Moreover, 11 U.S.C. § 363(m) provides that the reversal or modification on appeal of an authorization of a sale or lease of property does not affect the validity of the sale or lease under such authorization to an entity that purchased or leased the property in good faith. *See* 11 U.S.C. § 363(m).

58. Although the Bankruptcy Code does not define good faith, courts have recognized that the kind of misconduct that would destroy a good faith status involves fraud, collusion between the purchaser and other offerors or the trustee, or an attempt to take grossly unfair advantage of other offerors. *See In re Abbott Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).

59. Trustee and Purchaser have proceeded in good faith, and, upon information and belief, the Purchaser is a bona fide, good-faith purchaser and not an insider of Debtor, Trustee, or the Broker.

60. And, although Purchaser did enter into a contract to buy the Property from the Debtor (as indicated above), she did so with absolutely no knowledge of the Bankruptcy Case.

61. Consequently, Trustee and Purchaser are entitled to the protections of 11 U.S.C. § 363(m).

**Request for Authority to Disburse Certain Proceeds at Closing**

62. Trustee requests authority to have all sale proceeds paid to him at Closing and for authority to have paid at Closing: (a) the full loan payoff to F&M Bank; (b) all outstanding *ad*

*valorem* real property taxes owed to Henry County, including any pro-rated amount owed for tax year 2026; (c) the judgment lien claim of UAA in the amount of $30,402.96; (d) the lien claim of Danco in the amount of $2,024.04; (e) the secured claim of GDOR, on account of the 2022 GDOR Lien, in the amount of $27,071.65; (f) the real estate commission of six percent (5%) of the Purchase Price in the amount of $28,200.00 to Broker (inclusive of the share payable to the Buyer's Broker); (g) the Seller Contribution of $16,920.00; (h) the cost of the termite clearance letter and home warranty required by the Contract (approximately $700.00); (i) any capital gains or other taxes related to the sale (none anticipated); and (j) all other costs of sale, or costs necessary to close a sale of the Property, including the costs of mold remediation paid for by Purchaser in the amount of $1,200.00.

63. All other distributions will be made only upon further order of the Court. Without limiting the foregoing, Trustee will hold the remaining net sale proceeds, including the proceeds to which the Disputed Liens attach and an amount equal to the Claimed Exemption, pending further order of the Court.

64. To the extent funds are disbursed at Closing by a party other than Trustee, Trustee requests that such party be treated as Trustee's designated and authorized agent.

65. Upon information and belief, the proposed sale of the Property to Purchaser, together with the avoidance of the Disputed Liens, will allow Trustee to make a meaningful distribution to holders of priority and general unsecured claims against the Bankruptcy Estate.

**Other Relief Requested**

66. In addition, Trustee requests that the Court waive the stay of the order approving the proposed sale as authorized under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

WHEREFORE, Trustee respectfully requests that the Court enter an Order:

(a) Granting the Sale Motion;

(b) Authorizing and approving the Contract, including the Occupancy Agreement and Amendment #1 thereto;

(c) Authorizing and approving the sale of the Property to the Purchaser free and clear of all liens, interests, and encumbrances, including the Disputed Liens, with such liens, interests, and encumbrances attaching to the proceeds of the sale to the extent valid, perfected, enforceable, and unavoidable;

(d) Authorizing the proposed surcharges of the Lienholders' collateral set forth above;

(e) Authorizing Trustee to surcharge the Claimed Exemption pursuant to 11 U.S.C. § 522(k)(1) for the aliquot portion of the costs and expenses of avoiding the Disputed Liens, in an amount to be determined upon further application, and authorizing Trustee to hold an amount equal to the Claimed Exemption pending further order of the Court;

(f) Authorizing the distribution of certain proceeds at Closing, as set forth herein;

(g) Authorizing the proposed sale to be consummated immediately as allowed by Federal Rules of Bankruptcy Procedure Rule 6004(h); and

(h) Granting such other and further relief as the Court deems just or appropriate.

Respectfully submitted this 9th day of October, 2026.

ROUNTREE LEITMAN KLEIN & GEER, LLC
*Attorneys for Trustee*

By:*/s/ Michael J. Bargar*
Michael J. Bargar
Georgia Bar No. 645709
mbargar@rlkglaw.com

Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, GA 30329
404-410-1220

**EXHIBIT "A" FOLLOWS**

# PURCHASE AND SALE AGREEMENT

**Offer Date:** 9/29/2026

GeorgiaREALTORS®

**2026 Printing**

## A. KEY TERMS AND CONDITIONS

1. **Purchase and Sale.** The undersigned buyer(s) ("Buyer") agree to buy and the undersigned seller(s) ("Seller") agree to sell the real property described below including all fixtures, improvements and landscaping therein ("Property") on the terms and conditions set forth in this Agreement.
   a. **Property Identification:** Address: 209 Kingscastle Drive
   City ELLENWOOD, , County HENRY , Georgia, Zip Code 30294
   MLS Number: 10809243 Tax Parcel I.D. Number: 044H01003000
   b. **Legal Description:** The legal description of the Property is *[select one of the following below]*:
   ☐ (1) attached as an exhibit hereto;
   ☐ (2) Condominium (attach F204 Condominium Resale Purchase and Sale Exhibit)
   ☐ (3) the same as described in Deed Book ________, Page ________, et. seq., of the land records of the above county; **OR**
   ☒ (4) Land Lot(s) 223 of the 12 District, ____________ Section/ GMD, Lot 3 , Block ________, Unit ________, Phase/Section ________ of Kingsbrook Subdivision/Development, according to the plat recorded in Plat Book 44 , Page 173 , et. seq., of the land records of the above county.

2. **Purchase Price of Property to be Paid by Buyer.** $564000

3. **Seller's Monetary Contribution toward Buyer's Costs at Closing:** $3%

4. **Closing Date and Possession.** Closing Date shall be 11/4/2026 with possession of the Property transferred to Buyer ☒ upon Closing **OR** ☐ ___ days after Closing at ___ o'clock ☐ AM **OR** ☐ PM (attach F219 Temporary Occupancy Agreement).

5. **Closing Law Firm ("Closing Attorney").** LUEDER,LARKIN, & HUNTER, LLC.
   **Phone Number:** 770-727-6256

6. **Holder of Earnest Money ("Holder").** (If Holder is Closing Attorney, F510 must be attached as an exhibit hereto, and F511 must be signed by Closing Attorney.) LUEDER,LARKIN, & HUNTER, LLC.

7. **Earnest Money.** Earnest money will be paid to Holder in a method of payment acceptable to the Holder.
   ☐ **a.** $________________ as of the Offer Date.
   ☒ **b.** $ (SEE SPEC.STIPS) within 3 days from the Binding Agreement Date.
   ☐ **c.** ________________________________.

8. **Inspection and Due Diligence.**
   a. **Due Diligence Period:** Property is being sold subject to a Due Diligence Period of 0 days from the Binding Agreement Date.
   b. **Option Payment for Due Diligence Period:** In consideration of Seller granting Buyer the option to terminate this Agreement, Buyer:
   (1) has paid Seller $10.00 in nonrefundable option money, the receipt and sufficiency of which is hereby acknowledged; plus
   (2) shall pay directly to Seller additional option money of $________________ by ☐ check ☐ ACH or ☐ wire transfer of immediately available funds either ☐ as of the Offer Date; **OR** ☐ within _____ days from the Binding Agreement Date. Any additional option money paid by Buyer to Seller ☐ shall (subject to lender approval) or ☐ shall not be applied toward the purchase price at Closing and shall not be refundable to Buyer unless the Closing fails to occur due to the default of the Seller.

9. **Lead-Based Paint.** To the best of Seller's knowledge, the residential dwelling(s) on the Property (including any portion thereof or painted fixture therein) ☐ was (attach F316 Lead-Based Paint Exhibit) **OR** ☒ was not built prior to 1978.

10. **Brokerage Relationships in this Transaction.**
    a. **Buyer's Broker is** Gloria A. Watson Realty **and is:**
    (1) ☒ representing Buyer as a client.
    (2) ☐ working with Buyer as a customer.
    (3) ☐ acting as a dual agent representing Buyer and Seller.
    (4) ☐ acting as a designated agent where:
    ________________________________ has been assigned to exclusively represent Buyer.
    b. **Seller's Broker is** Keller Williams West Atlanta **and is:**
    (1) ☒ representing Seller as a client.
    (2) ☐ working with Seller as a customer.
    (3) ☐ acting as a dual agent representing Buyer and Seller.
    (4) ☐ acting as a designated agent where:
    ________________________________ has been assigned to exclusively represent Seller.
    c. **Material Relationship Disclosure:** The material relationships required to be disclosed by either Broker are as follows:
    N/A

11. **Time Limit of Offer.** The Offer set forth herein expires at 5:00 o'clock P.m. on the date OCTOBER 8, 2026 .

Buyer(s) Initials LA Seller(s) Initials SGH 10/08/26 6:06 PM EDT dotloop verified

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Gloria Watson IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.
Copyright© 2026 by Georgia Association of REALTORS®, Inc.

**B. FURTHER EXPLANATIONS TO CORRESPONDING PARAGRAPHS IN SECTION A.**

1. **Purchase and Sale.**
   a. **Warranty:** Seller warrants that at the time of Closing Seller will convey good and marketable title to said Property by limited warranty deed subject to: (1) zoning, subdivision and other governmental laws and regulations; (2) general utility, sewer, and drainage easements of record as of the Binding Agreement Date and upon which the improvements (other than any driveway, wall, fence, mailbox, or walkway) do not encroach; (3) declarations of condominium and declarations of covenants, conditions and restrictions of record on the Binding Agreement Date; (4) any title objection(s) raised by Buyer prior to Closing, which Seller was able to satisfy as set forth in the Examination section below or which Buyer waives; and (5) leases and other encumbrances specified in this Agreement. Buyer agrees to assume Seller's responsibilities in any leases specified in this Agreement and the Closing of the sale of the Property to Buyer shall not terminate any such leases.
   b. **Examination:** Buyer may examine title and/or obtain a survey of the Property and furnish Seller with a written statement of title objections at or prior to the Closing. If Seller fails or is unable to satisfy valid title objections at or prior to the Closing or any unilateral extension thereof, which would prevent the Seller from conveying good and marketable title to the Property, then Buyer, among its other remedies, may terminate the Agreement without penalty upon written Notice to Seller. Notwithstanding anything to the contrary contained herein, Seller shall be deemed to have satisfied Buyer's title objections if Seller can deliver good and marketable title to the Property, which for all purposes herein shall mean title which a title insurance company licensed to do business in Georgia will insure at its regular rates, subject only to standard exceptions.
   c. **Title Insurance:** Buyer hereby directs Closing Attorney and any mortgage lender involved in this transaction to quote the cost of title insurance based upon the presumption that Buyer will be obtaining an enhanced title insurance policy, if such a policy can be issued on the Property or for the Buyer in this transaction.

2. **Purchase Price to be Paid by Buyer.** The purchase price shall be paid in U.S. Dollars by such method of delivery acceptable to the Closing Attorney including, but not limited to, wire transfer of immediately available funds. Where this Agreement refers to sales price, it shall mean the same thing as the purchase price.

3. **Closing Costs.**
   a. **Seller's Monetary Contribution toward Buyer's Costs at Closing:** At Closing, Seller shall make the referenced Seller's Monetary Contribution which Buyer may use to pay any cost or expense of Buyer related to this transaction, including without limitation, any compensation obligations of Buyer. Buyer acknowledges that Buyer's mortgage lender(s) may not allow the Seller's Monetary Contribution, or the full amount thereof, to be used for some costs or expenses. In such event, any unused portion of the Seller's Monetary Contribution shall remain the property of the Seller.
   b. **Additional Items Paid by Seller:** In addition to the above, the Seller shall also pay the fees and costs necessary for Seller to convey good and marketable title to the Property and costs and fees of the Closing Attorney: (1) to obtain, prepare and record title curative documents, payoffs and estoppel letters; (2) for Seller not attending the Closing in person; and (3) to handle and deliver Seller's payoffs and proceeds.
   c. **Items Paid by Buyer:** At Closing, Buyer shall pay: (1) Georgia property transfer tax; (2) the cost to search title and tax records and prepare the limited warranty deed; and (3) all other costs, fees and charges to close or relating to the transaction.
   d. **Prorations:** Ad valorem property taxes, community association fees, solid waste and governmental fees and utility bills for which service cannot be terminated as of the date of Closing shall be prorated as of the date of Closing. Notwithstanding any provision to the contrary, in the event ad valorem property taxes are based upon an estimated tax bill or tax bill under appeal, the party who paid less than their pro rata share of taxes to the other party at Closing or collected more than their pro rata share of taxes from the other party at Closing, shall upon the issuance of the actual tax bill or any appeal being resolved, promptly pay the other party the amount necessary to correctly prorate the tax bill. In the event there are tax savings resulting from a tax appeal, third party professional costs to handle the appeal may be deducted from the savings for that tax year before re-prorating. Any pending tax appeal for the year in which the Property is sold shall be deemed assigned to Buyer at Closing. The liability to the county and if applicable, city, in which the Property is located for ad valorem real property taxes for the year in which the Property is sold shall be assumed by Buyer upon the Closing of the Property. Buyer agrees to indemnify Seller against any and all claims of the county and if applicable, city, for unpaid ad valorem real property taxes for the year in which the Property is sold.

4. **Closing Date and Possession.**
   a. **Right to Unilaterally Extend the Closing Date:** Buyer and Seller shall each have a limited right to unilaterally extend the Closing Date one (1) time for eight (8) days upon Notice to the other party given on or before the Closing Date. The party unilaterally extending the Closing Date shall state a valid basis for the delay from the reasons identified below in any such Notice to unilaterally extend the Closing Date.
      **(1) Buyer's Right to Unilaterally Extend the Closing Date**: On or before the Closing Date, Buyer may, upon Notice to Seller, unilaterally extend the Closing for eight (8) days for either of the following reasons:
         **i.** The Buyer's mortgage lender is not ready due to no fault of the Buyer; or
         **ii.** The Closing Attorney is not ready (except if the Seller has already unilaterally extended the Closing Date for this reason). If the Closing Attorney is not ready, it must be for reasons other than the Buyer caused the delay, the Buyer's mortgage lender is delayed or title objections still need to be resolved.
      **(2) Seller's Right to Unilaterally Extend the Closing Date**: On or before the Closing Date, Seller may also, upon Notice to Buyer, extend the Closing for eight (8) days for either of the following reasons:
         **i.** Valid title objections still need to be resolved, excluding title objections that (i) can either be satisfied through the payment of money or bonding off the same; or (ii) do not prevent Seller from conveying good and marketable title as defined herein); or
         **ii.** The Closing Attorney is not ready (except if Buyer has already unilaterally extended the Closing Date for this reason). If the Closing Attorney is not ready, it must be for reasons other than the Seller caused the delay, the Buyer's mortgage lender is delayed or title objections still need to be resolved.
   b. **Keys and Openers:** At Closing, Seller shall provide Buyer with all keys, door openers, fobs, access cards, codes and other similar equipment allowing access to the Property, the community, and community amenities. In the event Seller is required to return the above items to a third-party, Seller shall provide Buyer with instructions on how to contact the third-party to obtain such items.

c. **Devices and Fixtures:** Except as set forth above, if a system, device, or fixture conveyed with the Property ("Device") cannot be operated without a specific controller, then not later than time of possession, Seller will provide Buyer with all controllers which are required for the operation of the Devices. Seller will also provide Buyer with all Device credentials, including but not limited to usernames and passwords, for all Devices including access and guest codes OR Seller may reset Devices to factory defaults and provide Buyer with default credentials for all Devices. Seller will terminate Seller's administrative access and any access granted to a third-party. The cost of transferring third-party support to these Devices and confirming that Seller's and/or third-parties' administrative access is terminated is the responsibility of the Buyer.

5. **Closing Law Firm.** Buyer shall have the right to select the Closing Attorney to close this transaction, and hereby selects the Closing Attorney referenced herein. In all cases where an individual Closing Attorney is named in this Agreement but the Closing Attorney is employed by or an owner, shareholder, or member in a law firm, the law firm shall be deemed to be the Closing Attorney. If Buyer's mortgage lender refuses to allow that Closing Attorney to close this transaction, Buyer shall select a different Closing Attorney acceptable to the mortgage lender. The Closing Attorney shall represent the mortgage lender in any transaction in which the Buyer obtains mortgage financing. In transactions where the Buyer does not obtain mortgage financing, the Closing Attorney shall represent the Buyer in preparing the Closing documents, attempting to clear title of the Property to the satisfaction of the title insurance company, conducting the Closing, disbursing funds according to the settlement statement signed by the parties and Closing Attorney, timely recording deeds and issuing an owner's title insurance policy. Other than those services specifically listed above, nothing herein shall obligate the Closing Attorney to perform other legal services, including, but not limited to, certifying or warranting title of the Property, for the Buyer, except pursuant to a separate engagement agreement signed by the Closing Attorney and the Buyer.

6. **Holder of Earnest Money.** The earnest money will be paid to Holder in a method of payment acceptable to the Holder. Holder has the right to charge Buyer for any cost associated with receiving the earnest money. Such charge shall be collected separately from the payment of earnest money. The fact that Holder may represent one of the parties in this transaction as a client or is working with such party as a customer is acknowledged by all parties and shall not be a basis for Holder not performing any of its duties hereunder including, but not limited to, disbursing the earnest money based upon a reasonable interpretation of this Agreement. The earnest money will be deposited into Holder's escrow/trust account (with Holder being permitted to retain the interest if the account is interest bearing) not later than: (a) five (5) Banking Days after the Binding Agreement Date hereunder or (b) five (5) Banking Days after the date it is actually received if it is received after the Binding Agreement Date. If Buyer writes a check or pays with an ACH for earnest money, it must be drawn upon an account in a financial institution located in the United States. When the same is deposited into Holder's escrow/trust account, Holder shall not return the earnest money until the check or ACH has cleared the account on which the check was written or from which the ACH was sent. In the event any earnest money check or ACH is dishonored by the bank upon which it is drawn, or earnest money is not timely paid, Holder shall promptly give Notice of the same to Buyer and Seller. Buyer shall have three (3) Banking Days from the date of receiving the Notice to cure the default, and if Buyer does not do so, Holder shall promptly give Notice of the same to Buyer and Seller, and Seller may within seven (7) days thereafter terminate this Agreement upon Notice to Buyer. If Seller fails to terminate the Agreement timely, Seller's right to terminate based on the default shall be waived. In the event Holder's bank charges any fees related to Buyer's check or ACH being dishonored, Buyer stopping payment, or Buyer's failure to deliver Earnest Money, Holder shall notify the Buyer and the Buyer shall immediately reimburse Holder the cost of the fees in addition to fulfilling their earnest money obligations.

7. **Earnest Money.**

a. **Entitlement to Earnest Money:** Subject to the paragraph below, Buyer shall be entitled to the earnest money upon the: (1) failure of the parties to enter into a binding agreement; (2) failure of any unexpired contingency or condition to which this Agreement is subject; (3) termination of this Agreement due to the default of Seller; or (4) termination of this Agreement in accordance with a specific right to terminate set forth in the Agreement. Otherwise, the earnest money shall be applied towards the purchase price of the Property at Closing or if other funds are used to pay the purchase price then the earnest money shall be returned to Buyer.

b. **Disbursement of Earnest Money:** Holder shall disburse the earnest money upon: (1) the Closing of the Property; (2) a subsequent written agreement of Buyer and Seller; (3) an order of a court or arbitrator having jurisdiction over any dispute involving the earnest money; or (4) the failure of the parties to enter into a binding agreement (where there is no dispute over the formation or enforceability of the Agreement). In addition, Holder may disburse the earnest money upon a reasonable interpretation of the Agreement, provided that: 1) Holder first gives all parties at least ten (10) days Notice stating to whom and why the disbursement will be made; and 2) no interpretation shall be made by Holder dividing the earnest money between Buyer and Seller. Any party, real estate licensee or any other person having knowledge of or an interest in the disbursement of the earnest money may object to or provide information regarding the proposed disbursement by giving written Notice of the same to Holder within the above referenced notice period. Objections not timely made in writing shall be deemed waived. If Holder receives an objection or other information and, after considering it, decides to disburse the earnest money as originally proposed, Holder may do so and send Notice to the parties of Holder's action. If Holder decides to modify its proposed disbursement, Holder shall first send a new ten (10) day Notice to the parties stating the rationale for the modification and to whom the disbursement will now be made. Holder shall disburse the earnest money to Seller by check in the event Holder: (1) makes a reasonable interpretation of the Agreement that the Agreement has been terminated due to Buyer's default; and (2) sends the required ten (10) day Notice of the proposed disbursement to Buyer and Seller. The above-referenced check shall constitute liquidated damages in full settlement of all claims of Seller against Buyer and the Brokers in this transaction. Holder may require Seller to sign a W-9 before issuing a check to Seller for liquidated damages of $600 or more. Such liquidated damages are a reasonable pre-estimate of Seller's actual damages, which damages the parties agree are difficult to ascertain and are not a penalty.

c. **Interpleader:** If an earnest money dispute cannot be resolved after a reasonable time, Holder may interplead the earnest money into a court of competent jurisdiction if Holder is unsure who is entitled to the earnest money. Holder shall be reimbursed for and may deduct its costs, expenses and reasonable attorney's fees from any funds interpleaded. The prevailing defendant in the interpleader lawsuit shall be entitled to collect its attorney's fees, court costs and the amount deducted by Holder to cover Holder's costs and expenses from the non-prevailing defendant.

d. **Hold Harmless:** All parties hereby covenant and agree to: (1) indemnify and hold Holder harmless from and against all claims, injuries, suits and damages (collectively, "Claims") arising out of the performance by Holder of its duties, including Claims caused, in whole or in part, by the negligence of the Holder; (2) not to sue Holder for any decision of Holder to disburse earnest money in accordance with this Agreement.

8. **Inspection and Due Diligence.**
   a. **Buyer's Right to Inspect Property:** Unless otherwise specified herein, the Property is being sold in "as-is" condition with any and all faults. Therefore, Buyer and/or Buyer's representative(s) have the right to carefully inspect the Property to make sure it meets the needs of the Buyer. **If Buyer is concerned that the Property may have been used as a laboratory for the production of methamphetamine, or as a dumpsite for the same, Buyer should review the National Clandestine Laboratory Register – Georgia at www.dea.gov.**
   b. **Buyer's Responsibility to Inspect Neighborhood:** In every neighborhood there are conditions which different buyers may find objectionable. Buyer is solely responsible for becoming familiar with neighborhood conditions that could affect the Property such as landfills, quarries, power lines, airports, cemeteries, prisons, stadiums, odor and noise producing activities, crime, schools, zoning and land use, and government and transportation maps and plans. **If Buyer is concerned about the possibility of a registered sex offender residing in a neighborhood in which Buyer is interested, Buyer should review the Georgia Violent Sex Offender Registry available on the Georgia Bureau of Investigation Website at www.gbi.georgia.gov.** Neither Seller nor Seller's Broker shall have any duty to disclose information about sex offenders in the neighborhood.
   c. **Buyer's Inspection Rights Continue through Closing:** Upon prior Notice to Seller, Buyer and/or Buyer's representatives shall have the continuing right through Closing to enter the Property at Buyer's expense and at reasonable times to, among other things, and without limitation, conduct inspections, examinations, evaluations, appraisals, surveys and tests, meet contractors and vendors, measure for renovations, determine the condition of the Property and confirm that any agreed upon repairs have been made. Seller shall cause all utilities, systems and equipment to be on and all parts of the house to be accessible, including basements, attics, and crawlspaces so that Buyer may complete all inspections.
   d. **Buyer's Inspection Indemnification Obligations: Buyer agrees to hold Seller and all Brokers harmless from all claims, injuries and damages related to the exercise of the above inspection rights by Buyer and Buyer's representatives, and Buyer shall promptly pay Seller the actual cost to restore any portion of the Property damaged or disturbed from testing or other evaluations to a condition equal to or better than the condition it was prior to such testing or evaluations. Notwithstanding the above, this indemnification obligation shall not apply to damage resulting from defects in the Property uncovered during the inspection of the Property.**
   e. **Due Diligence Period:** If the Property is being sold subject to a Due Diligence Period, then: a) this Agreement shall be an option contract during which time Buyer shall have the option, for any reason or for no reason, to terminate this Agreement upon Notice to the Seller given prior to the expiration of the Due Diligence Period, in which case Buyer shall be entitled to a return of Buyer's earnest money without penalty; b) Buyer may, during the Due Diligence Period, seek to amend this Agreement to address any concerns Buyer has with the Property or this Agreement; and c) if Buyer has not terminated this Agreement as set forth above, Buyer shall accept the Property in "as-is" condition, subject to any amendment to this Agreement to address concerns agreed to by the parties.
   f. **Seller's Duty to Disclose**: Seller shall disclose to Buyer any and all known latent or hidden defects in the Property that could not be discovered by the Buyer during a reasonably careful inspection of the Property.
   g. **Warranties Transfer:** Seller agrees to transfer to Buyer, at Closing, subject to Buyer's acceptance thereof (and at Buyer's expense, if there is any cost associated with said transfer), Seller's interest in any existing manufacturer's warranties, service contracts, termite treatment and/or repair guarantee and/or other similar warranties which, by their terms, may be transferable to Buyer.
   h. **Repairs:** All agreed upon repairs and replacements shall be performed in a good and workmanlike manner prior to Closing unless otherwise agreed to in writing by the Buyer and Seller.

9. **Lead-Based Paint and Paint Hazard Evaluation.** If any portion of a residential dwelling on the Property was built prior to 1978, the Lead-Based Paint Exhibit (F316) is hereby attached as an exhibit to this Agreement. The term "residential dwelling" includes any painted fixture or material used therein that was built or manufactured prior to 1978. Buyer shall have the right to conduct a lead hazard evaluation within ten (10) days from the Binding Agreement Date (or other mutually agreed upon time period) and to terminate this Agreement without penalty upon Notice to Seller if lead-based paint and/or lead hazards are found (unless these rights are waived by Buyer in the Lead-Based Paint Exhibit (F316)). If the Lead-Based Paint Exhibit (F316) gives Buyer the right to terminate this Agreement if lead-based paint or lead hazards are found and such Notice of termination is not given within ten (10) days from Binding Agreement Date (or other mutually agreed upon time period), the right to terminate for lead-based paint and/or lead hazards shall be waived.

10. **Brokerage Relationships and Compensation in this Transaction.**
   a. **Agency Disclosure:** No Broker in this transaction shall owe a fiduciary duty or any other duty to Buyer or Seller greater than what is set forth in their brokerage engagements and the Brokerage Relationships in Real Estate Transactions Act, O.C.G.A. § 10-6A-1 et. seq.;
      **(3) No Agency Relationship:** Buyer and Seller acknowledge that: a) if they are not represented by Brokers in a client relationship, they are each solely responsible for protecting their own interests, and that Broker's role is limited to performing ministerial acts for that party; and b) if the same brokerage firm is representing one party as a client and working with the other party as a customer, the Broker and all of Broker's affiliated licensees are representing the client.
      **(4) Consent to Dual Agency:** If Broker is acting as dual agent in this transaction, Buyer and Seller consent to the same and acknowledge having been advised of the following:
         i. **Dual Agency Disclosure:** *[Applicable only if Broker is acting as a dual agent in this transaction.]*
            (a) As a dual agent, Broker is representing two clients whose interests are or at times could be different or even adverse;
            (b) Broker will disclose all adverse material facts relevant to the transaction and actually known to the dual agent to all parties in the transaction except for information made confidential by request or instructions from each client which is not otherwise required to be disclosed by law;
            (c) Buyer and Seller do not have to consent to dual agency and the consent of Buyer and Seller to dual agency has been given voluntarily and the parties have read and understand their brokerage engagement agreements.
            (d) Notwithstanding any provision to the contrary contained herein Buyer and Seller each hereby direct Broker while acting as a dual agent to keep confidential and not reveal to the other party any information which could materially and adversely affect their negotiating position.

dotloop signature verification: dtlp.us/XASR-dISz-CfzB
Authentisign ID: BAEE2B5B-62B3-F111-A6AB-000D3A4FF82A


ii. **Designated Agency Disclosure:** If Broker in this transaction is acting in a designated agency capacity, where one or more licensees of Broker are exclusively representing Buyer and one or more other licensees of Broker are exclusively representing Seller, Buyer and Seller consent to the same and acknowledge that each designated agent or agents shall exclusively represent the party to whom each has been assigned as a client.

b. **Compensation of Broker(s):** Buyer and Seller shall be obligated to pay their respective Compensation obligations, if any, to Broker(s) in full at Closing and as a pre-condition to Closing (so long as the same is permitted by Buyer's mortgage lender). The Closing Attorney is hereby authorized and directed to: (i) show the Compensation of the respective Broker(s) on the settlement statement at Closing; and (ii) disburse such Compensation to Broker(s) upon the consummation of Closing pursuant to the agreement(s) of party paying and receiving such Compensation. The acceptance by the Broker(s) of partial Compensation at Closing shall not relieve the party owing the same from paying the remainder after the Closing (unless the Broker(s) have expressly agreed in writing to accept the amount paid in full satisfaction of Broker's Compensation).

c. **Disclaimer:** Buyer and Seller have not relied upon any: a) promises, statements or representations (collectively, "Representations") of Brokers other than what is included in this Agreement, in an amendment thereto or in a Pre-Showing Compensation Agreement. This shall include Representations made after this Agreement is entered into that have not been made as an amendment hereto and agreed to by all parties. Brokers shall have no duty to determine whether the identities of the Buyer and/or Seller are legitimate or inspect the Property for termites, defects, hazardous conditions and/or repairs. The Brokers herein shall have no duty to advise Buyer or Seller on any matter relating to the Property which could have been revealed if Buyer: a) had obtained, with respect to the Property, a survey, appraisal, title search, Official Georgia Wood Infestation Report, utility bill review, septic system inspection, well water test, or test for radon, asbestos, mold, moisture, methamphetamine, and/or lead-based paint; b) had the Property inspected by a professional, construction expert, or structural, soils or environmental engineer; c) had this Agreement and transaction reviewed by an attorney, financial planner, mortgage consultant or tax consultant; and/or d) consulted appropriate governmental officials, maps, laws and regulations to determine, among other things and without limitation, the zoning of Property, the propensity of the Property to flood, flood zone certifications, and whether any condemnation action is pending or has been filed or other nearby governmental improvements are planned. Buyer and Seller acknowledge that Broker does not perform or have expertise in any of the matters handled by the professionals referenced above or in the above tests, inspections, evaluations and reviews. Buyer and Seller should seek independent expert advice regarding the above matters and any other matter of concern to them relative to the Property and this Agreement. Buyer and Seller acknowledge that Broker shall not be responsible to monitor, supervise, inspect or opine on whether the construction of or repairs to the Property were done properly and that such tasks clearly fall outside the scope of real estate brokerage services. Buyer and Seller further acknowledge that Brokers have no duty to ensure that Seller has terminated Seller's and/or third-parties' administrative access to Devices.

11. **Time Limit of Offer.** The Time Limit of the Offer shall be the date and time referenced herein when the Offer expires unless prior to that date and time both of the following have occurred: (a) the Offer has been accepted by the party to whom the Offer was made; and (b) Notice of acceptance of the Offer has been delivered to the party who made the Offer.

## C. OTHER TERMS AND CONDITIONS

1. **Notice.**

a. **Generally:** All Notices given hereunder shall be in writing, legible and signed by the party giving the Notice. In the event of a dispute regarding Notice, the burden shall be on the party giving Notice to prove delivery. The requirements of this Notice paragraph shall apply even prior to this Agreement becoming binding. Notices shall only be delivered: (1) in person; (2) by courier, overnight delivery service or by certified or registered U.S. mail (hereinafter collectively "Delivery Service"); or (3) by email or facsimile. The person delivering or sending the written Notice signed by a party may be someone other than that party.

b. **Delivery of Notice:** A Notice to a party shall be deemed to have been delivered and received upon the earliest of the following to occur: (1) the actual receipt of the written Notice by a party; (2) in the case of delivery by a Delivery Service, when the written Notice is delivered to an address of a party set forth herein (or subsequently provided by the party following the Notice provisions herein), provided that a record of the delivery is created; (3) in the case of delivery electronically, on the date and time the written Notice is electronically sent to an email address or facsimile number of a party set forth herein (or subsequently provided by the party following the Notice provisions herein) even if it is not opened by the recipient.

c. **When Broker Is Authorized to Accept Notice for Client:** Except where the Broker is acting in a dual agency capacity, the Broker representing a party in a client relationship shall be the authorized agent of the party for the limited purpose of receiving Notice and such Notice to any of them shall for all purposes herein be deemed to be Notice to the party.This shall include, without limitation, receiving Notices regarding the disbursement of earnest money after this Agreement has been terminated. Notice to an authorized agent shall only be effective if the written Notice is sent to an address, facsimile number or email address of the authorized agent set forth herein (or subsequently provided by the authorized agent following the Notice provisions herein) whether or not it is not opened by the recipient. Except as provided for herein, the Broker's staff at a physical address set forth herein of the Broker are authorized to receive Notices delivered by a Delivery Service. The Broker and the Broker's staff shall not be authorized to receive Notice on behalf of a party in any transaction in which a brokerage engagement has not been entered into with the party or in which the Broker is acting in a dual agency capacity. In the event the Broker is practicing designated agency, only the designated agent(s) of a client shall be the authorized agent(s) of the client for the purposes of receiving Notice.

2. **Default.**

a. **Remedies of Seller:** In the event this Agreement fails to close due to the default of Buyer, Seller's sole remedy shall be to retain the earnest money as full liquidated damages. Seller expressly waives any right to assert a claim for specific performance. The parties expressly agree that the earnest money is a reasonable pre-estimate of Seller's actual damages, which damages the parties agree are difficult to ascertain. The parties expressly intend for the earnest money to serve as liquidated damages and not as a penalty. Unless Seller has otherwise waived Seller's right to terminate due to the Buyer's failure to pay earnest money, Seller may, after the termination of this Agreement, sue Buyer for any portion of the Earnest Money that was either not paid, returned for insufficient funds, or the payment of which was stopped.

Copyright© 2026 by Georgia Association of REALTORS®, Inc. 

b. **Remedies of Buyer:** In the event this Agreement fails to close due to the default of Seller, Buyer may either (i) seek the specific performance of this Agreement or (ii) terminate this Agreement upon Notice to Seller and Holder, in which case all earnest money deposits and other payments Buyer has paid towards the purchase of the Property shall be returned to Buyer following the procedures set forth elsewhere herein, and Buyer may pursue any other remedy available at law.

c. **Rights of Broker:** The Brokers involved in this transaction shall be express third-party beneficiaries of this Agreement, shall have the right to enforce all provisions in this Agreement that benefit them or afford them rights and defenses and shall have all remedies at law or in equity in the event of a breach of this Agreement. In the event this Agreement is terminated or fails to close due to the default of a party hereto, the defaulting party shall pay as liquidated damages to each Broker involved in the transaction an amount equal to the Compensation each Broker would have received had the transaction closed. If the same Broker is working with or representing the buyer and seller in the transaction, the Compensation the Broker shall be entitled to in the event of the default shall be the total Compensation the Broker would have received from all parties in the transaction had the transaction closed. For purposes of determining the amount of liquidated damages to be paid by the defaulting party, all written agreements establishing the amount of Compensation to be paid to any broker involved in this transaction are incorporated herein by reference. Additionally, upon the request of any party to the transaction, the Broker(s) shall disclose in writing the Compensation they will receive when the transaction closes so that the party knows the exact amount of liquidated damages they will be obligated to pay should the party default herein.

d. **Attorney's Fees:** In any litigation or arbitration arising out of this Agreement, including but not limited to breach of contract claims between Buyer and Seller and Compensation claims brought by a broker, the non-prevailing party shall be liable to the prevailing party for its reasonable attorney's fees and expenses.

3. **<u>Risk of Damage to Property</u>.** Seller warrants that at the time of Closing the Property and all items remaining with the Property, if any, will be in substantially the same condition (including conditions disclosed in the Seller's Property Disclosure Statement or Seller's Disclosure of Latent Defects and Fixtures Checklist) as of the Offer Date, except for changes made to the condition of Property pursuant to the written agreement of Buyer and Seller. Notwithstanding the above, if the Property is destroyed or substantially destroyed prior to Closing, Seller shall promptly give Notice to Buyer of the same and provide Buyer with whatever information Seller has regarding the availability of insurance and the disposition of any insurance claim. Buyer or Seller may terminate this Agreement without penalty not later than fourteen (14) days from receipt of the above Notice. If Buyer or Seller do not terminate this Agreement, Seller shall cause Property to be restored to substantially the same condition as on the Offer Date. The date of Closing shall be extended until the earlier of one year from the original date of Closing, or seven (7) days from the date that Property has been restored to substantially the same condition as on the Offer Date and a new certificate of occupancy (if required) is issued.

4. **<u>Other Provisions</u>.**

a. **Condemnation:** Seller shall: (1) immediately notify Buyer if the Property or a portion thereof becomes subject to a condemnation proceeding or if Seller has received notice of a pending condemnation proceeding; and (2) provide Buyer with all written communications regarding the same. Upon receipt of such notice, Buyer shall have the right, but not the obligation for 7 days thereafter, to terminate this Agreement upon Notice to Seller in which event Buyer shall be entitled to a refund of all earnest money and other monies paid by Buyer toward the Property without deduction or penalty. If Buyer does not terminate the Agreement within this time frame, Buyer agrees to accept the Property less any portion taken by the condemnation and if Buyer closes, Buyer shall be entitled to receive any condemnation award or negotiated payment for all or a portion of the Property transferred or conveyed in lieu of condemnation.

b. **Consent to Share Non-Public Information:** Buyer and Seller hereby consent to the Closing Attorney preparing and distributing an American Land Title Association ("ALTA") Estimated Settlement Statement-Combined or other combined settlement statement to Buyer, Seller, Brokers and Brokers' affiliated licensees working on the transaction reflected in this Agreement for their various uses.

c. **Delays Caused by Emergencies:** If at any point after the Binding Agreement date the Governor of Georgia declares a state of emergency for the county in which the Property is located, all unexpired time deadlines herein, including but not limited to the Closing Date, shall automatically extend for the number of days the emergency exists in that county, but not more than eight (8) days. Nothing herein shall prevent the parties by mutual agreement from proceeding forward without extending such deadlines. No deadline shall be extended if this Agreement becomes a binding agreement during a state of emergency.

d. **Digital Signatures:** For all purposes herein, a digital or facsimile signature shall be deemed the same as an original signature; provided, however, that all parties agree to promptly re-execute a conformed copy of this Agreement with original signatures if requested to do so by, the Buyer's mortgage lender or the other party.

e. **Duty to Cooperate:** All parties agree to do all things reasonably necessary to timely and in good faith fulfill the terms of this Agreement. Buyer and Seller shall execute and deliver such certifications, affidavits, and statements required by law or reasonably requested by the Closing Attorney, mortgage lender and/or the title insurance company to meet their respective requirements.

f. **Entire Agreement, Modification and Assignment:** Except for any Pre-Showing Compensation Agreement or other separate agreement for the payment of Broker's Compensation, that is not a part of or amended by this Agreement, this Agreement constitutes the sole and entire agreement between all of the parties, supersedes all of their prior written and verbal agreements and shall be solely relied upon by the Buyer and binding upon the parties and their successors, heirs and permitted assigns. No representation, statement, promise or inducement not included in this Agreement shall be relied upon or binding upon any party hereto. This Agreement may not be amended, deemed to have been mutually departed from or waived except upon the written agreement of Buyer and Seller. Any agreement to terminate this Agreement or any other subsequent agreement of the parties relating to the Property must be in writing and signed by the parties. This Agreement may only be assigned (SS611) or listed for sale in a multiple listing service by Buyer prior to Closing with the written approval of Seller which may be withheld for any reason or no reason. Any assignee shall fulfill all the terms and conditions of this Agreement, including but not limited to, the obligation to pay the Compensation owed by the assignor.

g. **Extension of Deadlines:** No time deadline under this Agreement shall be extended by virtue of it falling on a Saturday, Sunday or federal holiday except for the date of Closing.

h. **FIRPTA:** Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), Sellers who are not a "foreign person" as that term is defined in Section 1445(f)(3) of the Internal Revenue Code, shall deliver to the Closing Attorney at Closing a FIRPTA Affidavit. If Seller is a "foreign person" additional taxes may need to be withheld at Closing.

dotloop signature verification: dtlp.us/XASR-dISz-CfzB
Authentisign ID: BAEE2BB5B-62B3-F111-A5A9-000D3A4FF82A


**i. GAR Forms:** The Georgia Association of REALTORS®, Inc. ("GAR") issues certain standard real estate forms. These GAR forms are frequently provided to the parties in real estate transactions. No party is required to use any GAR form. These forms are generic and written with the interests of multiple parties in mind. The parties agree to carefully review the GAR Forms to be used in this transaction and modify the same to meet their specific needs. If any party has any questions about their rights and obligations under any GAR form, they should consult an attorney. Provisions in the GAR Forms may be subject to differing interpretations by our courts other than what the parties may have intended. Our courts may at times strike down or not enforce provisions in our GAR Forms, as written. No representation is made that the GAR Forms will protect the interests of any particular party or will be fit for any specific purpose. The parties hereto agree that the GAR forms may only be used in accordance with the licensing agreement of GAR. While GAR forms may be modified by the parties, no GAR form may be reproduced with sections removed, altered or modified unless the changes are visible on the form itself or in a stipulation, addendum, exhibit or amendment thereto.

**j. Governing Law and Interpretation:** This Agreement may be signed in multiple counterparts each of which shall be deemed to be an original and shall be interpreted in accordance with the laws of Georgia. No provision herein, by virtue of the party who drafted it, shall be interpreted less favorably against one party than another. All references to time shall mean the time in Georgia. If any provision herein is held to be unenforceable, it shall be severed from this Agreement while the remainder of the Agreement shall, to the fullest extent permitted by law, continue to have full force and effect as a binding contract.

**k. No Authority to Bind:** No Broker or affiliated licensee of Broker, by virtue of this status, shall have any authority to bind any party hereto to any contract, provisions therein, amendments thereto, termination thereof or to Notices signed by Broker but not the party. However, if authorized in this Agreement, Broker shall have the right to accept Notices on behalf of a party (but not send Notices from Broker on behalf of a party unless they are signed by the party). Additionally, any Broker or real estate licensee involved in this transaction may perform the ministerial act of filling in the Binding Agreement Date. In the event of a dispute over the Binding Agreement Date, it shall be resolved by a court or arbitrator having jurisdiction over the dispute, by the written agreement of the Buyer and Seller, or by the Holder but only in making a reasonable interpretation of the Agreement in disbursing earnest money.

**l. No Recording of Agreement:** Buyer shall not record (or permit to be recorded) this Agreement or any memorandum or summary thereof in the Office of Land Records. Buyer shall be liable for damages for violating this section of the Agreement. Nothing herein shall prohibit Buyer from recording a *lis pendens* as part of filing a lawsuit claiming an interest in the Property.

**m. Notice of Binding Agreement Date:** The Binding Agreement Date shall be the date when a party to this transaction who has accepted an offer or counteroffer to buy or sell real property delivers Notice of that acceptance to the party who made the offer or counteroffer in accordance with the Notices section of the Agreement. Notice of the Binding Agreement Date may be delivered by either party (or the Broker working with or representing such party) to the other party. If Notice of accurate Binding Agreement Date is delivered, the party receiving Notice shall sign the same and immediately return it to the other party. Notwithstanding any other provision to the contrary contained in this Agreement, it is the express intent of this section that (1) a broker or licensee involved in the real estate transaction may perform the ministerial task of filling in the Binding Agreement Date and (2) sending a fully signed purchase and sale agreement with a specific Binding Agreement Date included, that one of the parties has agreed to, constitutes Notice of the Binding Agreement Date to the other party.

**n. Objection to Binding Agreement Date:** If the Buyer or Seller objects to the date entered as the Binding Agreement Date, then within one (1) day from receiving Notice of Binding Agreement Date, the party objecting shall send Notice of the objection to the other party. The objection shall be resolved by the written amendment between the Buyer and Seller by executing a binding agreement date confirmation (F733). The absence of an agreement on the Binding Agreement Date shall not render this Agreement unenforceable. The failure of a party to timely object will result in the parties accepting the Binding Agreement Date as entered.

**o. Property to Be Delivered in Clean Condition:** Notwithstanding any other provision to the contrary, at the time of possession, Seller shall deliver the Property in clean condition, free of trash, garbage, debris, construction materials, pets and personal property of the Seller not otherwise identified in this Agreement as remaining with the Property. Firewood shall not be considered debris. This section shall apply even in transactions where the Property is being sold as-is.

**p. Rules for Interpreting This Agreement:** In the event of internal conflicts or inconsistencies in this Agreement, the following rules for how those conflicts or inconsistencies shall be resolved will apply:

(1) Handwritten changes shall control over pre-printed or typed provisions;

(2) Exhibits shall control over the main body of the Agreement;

(3) Special Stipulations shall control over both exhibits and the main body of the Agreement, including handwritten changes thereto;

(4) Notwithstanding the above, the Amendatory Clause in the FHA or VA Exhibit shall control over inconsistent or conflicting provisions contained elsewhere in this Agreement. Buyer and Seller acknowledge and agree that the "Agreement to Seek Amendment to Purchase Price Prior to Termination" section in the FHA or VA Exhibits does not conflict and is not inconsistent with the Amendatory Clause.

(5) Except as otherwise provided herein, this agreement and any amendment thereto shall be enforceable, as between the parties, even without the signature of any Broker referenced herein. Notwithstanding the above, if any provision(s) in this Agreement, including a provision(s) in any amendment hereto, changes the total amount of Compensation due to any Broker from the total amount of Compensation said Broker has previously agreed to in writing, then such change to the Broker's Compensation shall only be binding if the Broker impacted by such change consents to the same in writing. If a Buyer's Broker Compensation Exhibit (F259) is attached as an exhibit to this Agreement, this Agreement shall not be enforceable unless this Agreement or such Buyer's Broker Compensation Exhibit is initialed by the Buyer's Broker and, in cases where the Seller's Broker is sharing a portion of its Compensation with the Buyer's Broker, the Seller's Broker.

(6) If Broker has written any special stipulations herein, the party for whom such special stipulations were written: a) confirms that each such stipulation fully and accurately reflects that party's intentions; b) accepts each special stipulation as if it were written by such party; and c) hereby agrees to indemnify and hold Broker who prepared the stipulation harmless from any and all claims, causes of action, suits, and damages arising out of or relating to such special stipulation.

(7) If Broker answers a question of Buyer or otherwise describes some aspect of the Property or the transaction, Broker is doing so based upon information provided by Seller rather than the independent knowledge of Broker (unless Broker makes an independent written disclosure to the contrary).

Copyright© 2026 by Georgia Association of REALTORS®, Inc.

q. **Survival of Agreement:** The following shall survive the Closing of this Agreement: (1) the obligation of a party to Compensation referenced herein; (2) any warranty of title; (3) all written representations of Seller in this Agreement regarding the Property or neighborhood in which the Property is located; (4) Buyer's indemnification obligations arising out of the inspection of the Property by Buyer and Buyer's representatives; (5) the section on condemnation; (6) the section on attorney's fees; (7) the obligations of the parties regarding ad valorem real property taxes; (8) obligations set forth in the Devices and Fixtures Section; (9) Seller's liability for not timely removing items from the Property that Seller agreed to remove; (10) the ability of Broker to receive Notices on behalf of a client after the termination of this Agreement; and (11) any obligations which the parties herein agree shall survive the Closing or may be performed or fulfilled after the Closing.

r. **Terminology:** As the context may require in this Agreement: (1) the singular shall mean the plural and vice versa; and (2) all pronouns shall mean and include the person, entity, firm, or corporation to which they relate.

s. **Time of Essence:** Time is of the essence of this Agreement.

5. **Definitions.**

a. **Banking Day:** A "Banking Day" shall mean a day on which a bank is open to the public for carrying out substantially all of its banking functions. For purposes herein, a "Banking Day" shall mean Monday through Friday excluding federal holidays.

b. **Binding Agreement Date:** The "Binding Agreement Date" shall be the date when a party to this transaction who has accepted an offer or counteroffer to buy or sell real property delivers Notice of that acceptance to the party who made the offer or counteroffer in accordance with the Notices section of the Agreement. Once that occurs, this Agreement shall be deemed a Binding Agreement.

c. **Broker:** In this Agreement, the term "Broker" shall mean the licensed Georgia real estate broker(s) or brokerage firm(s) and their affiliated licensees in this transaction except as may be specifically provided otherwise herein.

d. **Business Day:** A "Business Day" shall mean a day on which substantially all businesses are open for business. For all purposes herein, a "Business Day" shall mean Monday through Friday excluding federal holidays.

e. **Client:** "Client" shall mean a party who is being represented by a Broker pursuant to a written brokerage engagement agreement.

f. **Closing:** The Closing shall be the event in which the parties consummate the transaction set forth in this Agreement by: (1) the Seller tendering the deed referenced herein to the Property; (2) the Buyer paying the required consideration hereunder; (3) both parties properly signing all documents and paperwork as required by the Closing Attorney; and (4) both parties fulfilling other agreements set forth herein that must be fulfilled by the Closing (unless the same have been waived or amended). The Closing shall be deemed consummated when the Closing Attorney confirms to the parties that the Closing Attorney is in receipt of all required paperwork, funds, and approvals necessary to complete the transaction and directs for funds to be disbursed and documents to be recorded. All parties acknowledge that the deed will not normally be recorded in the land records on the day of Closing, and the payment of the sales proceeds may not always be made to Seller on the day of Closing (even though the Closing has been consummated) due to certain circumstances such as, for example, the Seller not being at the Closing in person, the Closing occurring after the cutoff for wiring funds that day, or the terms of an escrow agreements signed by the Seller have not been fulfilled resulting in which a portion of Seller's funds being held back.

g. **Compensation:** The term "Compensation" as used in this Agreement shall mean the compensation to be received by Broker, for performing real estate brokerage services in this transaction, regardless of whether it is a flat fee, percentage, bonus or some other method of compensation.

h. **Customer:** The term "Customer" shall mean a party or parties who are not being represented as clients by the Broker with whom the party or parties are working and for whom the Broker may only perform ministerial acts.

i. **Day:** For the purposes of this Agreement, the term "Day" shall mean a full calendar day ending at 11:59 p.m., except as may be provided for elsewhere herein. For the purposes of counting days for determining deadlines, the specific date referenced as either the Binding Agreement Date or the date from which the deadline shall be counted will be day zero.

j. **Material Relationship:** A material relationship shall mean any actually known personal, familial, social, or business relationship between the broker or the broker's affiliated licensees and any other party to this transaction which could impair the ability of the broker or affiliated licensees to exercise fair and independent judgment relative to their client.

k. **Use of Initials "N/A":** The use of the initials "N/A" or "N.A." in filling out a blank in this Agreement shall mean "not applicable".

6. **WARNING TO BUYERS AND SELLERS: BEWARE OF CYBER-FRAUD.** Fraudulent emails attempting to get the buyer and/or Seller to wire money to criminal computer hackers are increasingly common in real estate transactions. Specifically, criminals are impersonating the online identity of the actual mortgage lender, Closing Attorney, real estate broker or other person or companies involved in the real estate transaction. In that role, the criminals send fake wiring instructions attempting to trick buyers and/or Sellers into wiring them money related to the real estate transaction, including, for example, the buyer's earnest money, the cash needed for the buyer to close, and/or the Seller's proceeds from the Closing. These instructions, if followed, will result in the money being wired to the criminals. In many cases, the fraudulent email is believable because it is sent from what appears to be the email address/domain of the legitimate company or person responsible for sending the buyer or Seller wiring instructions. The buyer and/or Seller should verify wiring instructions sent by email by independently looking up and calling the telephone number of the company or person purporting to have sent them. Buyers and Sellers should never call the telephone number provided with wiring instructions sent by email since they may end up receiving a fake verification from the criminals. Buyer and Sellers should be on special alert for: 1) emails directing the buyer and/or Seller to wire money to a bank or bank account in a state other than Georgia; and 2) emails from a person or company involved in the real estate transaction that are slightly different (often by one letter, number, or character) from the actual email address of the person or company.

dotloop signature verification: dtlp.us/XASR-dlSz-CfzB
Authentisign ID: BAE23B5B-62B3-F111-A6A9-000D3A4FF82A


7. **HEIGHTENED IDENTIFICATION PROCEDURES TO HELP PREVENT FRAUD; COVENANT NOT TO SUE.** There has been a significant increase in criminals attempting to sell properties they do not own by posing as the owners of those properties. To help prevent such crimes, Seller shall immediately, upon request of either the Seller's Broker and/or the Closing Attorney: 1) provide the requesting party with information confirming the Seller's identity, including a current government issued photo identification; 2) meet in person or through audio-visual conferencing to confirm the Seller's identity; and 3) if the Seller is a legal entity, provide the requesting party with the organizational and operating documents of such entity and current photo identification and either meet in-person or in audio-visual meeting with the executor, manager, trustee, general partner, officer, administrator, or other person in a comparable role of the legal entity to confirm their identity. Seller further agrees to cooperate with the Closing Attorney's heightened identification procedures which shall at least meet the standards, if any, supplied by a title insurance company for whom the Closing Attorney is an agent. Seller acknowledges that the transaction may not be able to close unless such procedures are followed. In the event Seller breaches its obligations hereunder, Seller shall be in default of this Agreement. Buyer acknowledges that identity theft may occur regardless of the measures undertaken by the parties, their respective brokers and the attorney(s) involved in the transaction to confirm the Seller's identity. For and in consideration of $10.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Buyer covenants not to sue any Broker(s) and/or the Closing Attorney involved in this real estate transaction for damages arising out of or relating to a fraudulent Seller.

8. **LIMIT ON BROKER'S LIABILITY AND STATUTE OF LIMITATIONS. BUYER AND SELLER ACKNOWLEDGE THAT BROKER(S):**
   a. **SHALL, UNDER NO CIRCUMSTANCES, HAVE ANY LIABILITY GREATER THAN THE AMOUNT OF COMPENSATION PAID HEREUNDER TO BROKER (EXCLUDING ANY COMPENSATION AMOUNT PAID TO A COOPERATING REAL ESTATE BROKER, IF ANY) OR, IF NO COMPENSATION IS PAID TO BROKER, THAN THE SUM OF $100; AND**
   b. **NOTWITHSTANDING THE ABOVE, SHALL HAVE NO LIABILITY IN EXCESS OF $100 FOR ANY LOSS OF FUNDS AS THE RESULT OF WIRE OR CYBER FRAUD.**
   c. **STATUTE OF LIMITATIONS: FOR AND IN CONSIDERATION OF THE SUM OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE THEREBY ACKNOWLEDGED, ALL CLAIMS OF ANY NATURE WHATSOEVER AGAINST BROKER(S) AND/OR THEIR AFFILIATED LICENSEES INVOLVED IN THIS TRANSACTION, WHETHER ASSERTED IN LITIGATION OR ARBITRATION AND SOUNDING IN BREACH OF CONTRACT AND/OR TORT, MUST BE BROUGHT WITHIN ONE (1) YEAR FROM THE DATE ANY CLAIM OR CAUSE OF ACTION ARISES. SUCH ACTIONS SHALL THEREAFTER BE TIME-BARRED. ALL BROKERS REFERENCED HEREIN SHALL BE EXPRESS THIRD-PARTY BENEFICIARIES OF THIS PROVISION.**

9. **Exhibits and Addenda.** All exhibits and/or addenda attached hereto, listed below, or referenced herein are made a part of this Agreement.

- ☐ Back-up Agreement Contingency Exhibit (F604) "_______"
- ☒ Buyer's Broker Compensation Exhibit (F259) "D"
- ☒ Closing Attorney Acting as Holder of Earnest Money Exhibit (F510) "C"
- ☐ Community Association Disclosure Exhibit (F322) "_______"
- ☐ Condominium Resale Purchase and Sale Exhibit (F204) "_______"
- ☒ Conventional Loan Contingency Exhibit (F404) "A"
- ☐ FHA Loan Contingency Exhibit (F407) "_______"
- ☐ Lead-Based Paint Exhibit (F316) "_______"
- ☐ Lease Purchase and Sale Exhibit (F207) (to be used with F916) "_______"
- ☐ Lease for Lease/Purchase Agreement (F916) (to be used with F207) "_______"
- ☐ Legal Description Exhibit (F807 or other) "_______"
- ☐ Loan Assumption Exhibit (F416) "_______"
- ☐ No Financing Contingency Exhibit (F401) "_______"
- ☐ Sale or Lease of Buyer's Property Contingency Exhibit (F601) "_______"
- ☒ Seller's Property Disclosure Statement Exhibit (F301, F302, F304, F307 or F310) "B"
- ☐ Survey of Property as Exhibit "_______"
- ☐ Temporary Occupancy Agreement for Seller after Closing Exhibit (F219) "_______"
- ☐ USDA-RD Loan Contingency Exhibit (F413) "_______"
- ☐ VA Loan Contingency Exhibit (F410) "_______"
- ☒ Other INSTRUCTIONS TO CLOSING ATTORNEY
- ■ Other SPECIAL STIPULATIONS (EXHIBIT "F")
- ☐ Other _______________________

**SPECIAL STIPULATIONS:** The following Special Stipulations are made a part of this Agreement.

**ALL PARTIES AGREE THAT THE SELLER SHALL PROVIDE A TERMITE CLEARANCE LETTER AND H.O.W.(@$700)**

**ALL LIGHT FIXTURES , WINDOW TREATMENTS AND BLINDS SHALL REMAIN.**

**SELLER AGREES TO PAY 2% CLOSING COSTS TO THE BUYER'S BROKER.**

**BUYER HAS ALREADY WIRED THE $5000 EARNEST MONEY TO LUEDER, LARKIN & HUNTER.**

The Special Stipulations attached as Exhibit "F" (the "Special Stipulations") are made a part of this Agreement. In the event of any conflict between the Special Stipulations and the language in the body of the Agreement, in the original PDF format, the language in the Special Stipulations shall control.

☐ **Additional Special Stipulations (F246) are attached.**

**By signing this Agreement, Buyer and Seller acknowledge that they have each read and understood this Agreement and agree to its terms.**

If Buyer or Seller is a legal entity, this Agreement must be signed by one or more authorized persons, as required in the entity's legal documents. The person's signature must include the capacity in which the person is signing, such as "Trustee", "General Partner", "Manager", "President", etc.

## Buyer Acceptance and Contact Information

LAQUANTIS A. HALL
1 **Buyer's Signature**

LAQUANTIS A. HALL — 09/29/2026
Print or Type Name — Date

Buyer's Address for Receiving Notice

Buyer's Phone Number: ☐ Cell ☐ Home ☐ Work

quantisannette@me.com
Buyer's Email Address

2 **Buyer's Signature**

Print or Type Name — Date

Buyer's Address for Receiving Notice

Buyer's Phone Number: ☐ Cell ☐ Home ☐ Work

Buyer's Email Address

☐ **Additional Signature Page (F267) is attached.**

## Seller Acceptance and Contact Information

S. Gregory Hays (dotloop verified 10/08/26 6:06 PM EDT CPTU-UX1I-JDGH-KZCU)
1 **Seller's Signature**

S. Gregory Hays as Chapter 7 Trustee for Bankruptcy Estate for Curtis Hinton — 10/08/2026
Print or Type Name — Date

GA
Seller's Address for Receiving Notice

Seller's Phone Number: ☐ Cell ☐ Home ☐ Work

Seller's Email Address

2 **Seller's Signature**

Print or Type Name — Date

Seller's Address for Receiving Notice

Seller's Phone Number: ☐ Cell ☐ Home ☐ Work

Seller's Email Address

☐ **Additional Signature Page (F267) is attached.**

## Buyer's Broker/Affiliated Licensee Contact Information

Gloria A. Watson Realty
Buyer Brokerage Firm

Gloria Watson — 09/29/2026
**Broker/Affiliated Licensee Signature** — Date

Gloria Watson — 103955
Print or Type Name — GA Real Estate License #

770-316-4449
Licensee's Phone Number — Fax Number

gwatson059@gmail.com
Licensee's Email Address

FCBOR
REALTOR® Membership

115 Millhaven Landing Fayetteville GA 30215
Broker's Address

770-316-4449 — 770-716-2329
Broker's Phone Number — Fax Number

GWAT01 — 46813
MLS Office Code — Brokerage Firm License Number

## Seller's Broker/Affiliated Licensee Contact Information

Keller Williams West Atlanta
Seller Brokerage Firm

L Knight (dotloop verified 09/29/26 10:04 PM EDT I1NG-J275-POFR-V1KK)
**Broker/Affiliated Licensee Signature** — Date

Lakisha Knight — 352620
Print or Type Name — GA Real Estate License #

404-202-5372
Licensee's Phone Number — Fax Number

lakishaknight@kw.com
Licensee's Email Address

ARA
REALTOR® Membership

2700 Cumberland Pkwy. Ste 400 Atlanta, Ga 30339
Broker's Address

470-907-8266
Broker's Phone Number — Fax Number

KWWA01 — H-80830
MLS Office Code — Brokerage Firm License Number

**Binding Agreement Date:** The Binding Agreement Date in this transaction is the date of 10/08/2026 and has been filled in by Lakisha Knight.

**Copyright© 2026 by Georgia Association of REALTORS®, Inc.** 

# CONVENTIONAL LOAN CONTINGENCY
# EXHIBIT "A"

GeorgiaREALTORS®

**2026 Printing**

This Exhibit is part of the Agreement with an Offer Date of 9/29/2026 for the purchase and sale of that certain Property known as: 209 Kingscastle Drive, ELLENWOOD, Georgia 30294.

1. **Application.** Buyer shall promptly apply for and in good faith seek to obtain the conventional loan or loans described below ("Loan(s)") such that Buyer can fulfill Buyer's obligations hereunder prior to the expiration of this Conventional Loan Contingency. *[Select A. or A. and B. below. Any box not selected shall not be a part of this Agreement. All Loan terms must be filled in.]*

| | | Loan Amount | Term | Interest Rate (at par) | Rate Type |
|---|---|---|---|---|---|
| ☒ A. | FIRST MORTGAGE LOAN | 97 % of purchase price | 30 years | Not greater than ______% per annum (or initial rate on adjustable loan) | ☒ Fixed<br>☐ Adjustable<br>☐ Interest Only |
| ☐ B. | SECOND MORTGAGE LOAN | ______% of purchase price | ______ years | Not greater than ______% per annum (or initial rate on adjustable loan) | ☐ Fixed<br>☐ Adjustable<br>☐ Interest Only |

2. **Use of Particular Lender**. Buyer may apply for approval of the Loan(s) with any mortgage lender, mortgage broker or mortgage loan originator licensed to do business in Georgia (hereinafter collectively, "Lender"). If any Lender is identified below ("Approved Lender"), Buyer shall apply for approval of the Loan(s) with at least one such Approved Lender. Nothing herein shall require Buyer to obtain mortgage financing from an Approved Lender herein.

   **Approved Lender(s)**
   NAVY FEDERAL CREDIT UNION Cole Lenox Mortgage Processor I NMLS # 2658230 t: 850-751-7690
   Cole_Lenox@navyfederal.org
   5550 Heritage Oaks Dr, Pensacola, FL 32526

3. **Length of the Financing Contingency Period**. The length of the Financing Contingency Period in Section 7 below shall be 1 days from the Binding Agreement Date.

4. **Length of Time for Buyer to Request a Reduction in the Purchase Price Based Upon a Low Appraisal**. The time period for Buyer to request a reduction in the purchase price of the Property, if it appraises for less than the purchase price of the Property, as set forth in Section 14 below, shall be 7 days from the Binding Agreement Date.

5. **Buyer May Apply for Different Loan(s).** A Loan Denial Letter (as that term is defined below) must be for the Loan(s) described above. Buyer may also apply for different conventional loans than the Loan(s) described above. However, the denial of such other loans shall not be a basis for Buyer to terminate this Agreement. Notwithstanding the above, Buyer shall not have a right to apply for a FHA, VA, or USDA loan unless the parties agree to amend this Agreement to add a FHA, VA, or USDA loan contingency exhibit meeting FHA, VA or USDA requirements, as the case may be (in which event this Conventional Loan Contingency shall no longer be part of this Agreement). Nothing herein shall require the Seller to agree to amend this Agreement.

6. **Buyer to Notify Seller of Intent to Proceed.** When it is known, Buyer shall promptly notify Seller of any mortgage lender to whom Buyer has sent a notice of intent to proceed with loan application and the name and contact information for the loan originator.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Gloria Watson IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.
Copyright© 2026 by Georgia Association of REALTORS®, Inc.

dotloop signature verification: dtlp.us/XASR-dISz-CfzB
Authentisign ID: 5A9E8F23-6DC3-F111-A5A9-000D3A4FF82A


7. **Financing Contingency.** Buyer shall have a Financing Contingency set forth in Section 3 above to determine if Buyer has the ability to obtain the Loan(s) described above ("Financing Contingency Period"). Buyer shall be deemed to have the ability to obtain the Loan(s) unless prior to the end of the Financing Contingency Period, Buyer: a) notifies Seller that Buyer is terminating the Agreement because Buyer has been turned down for the Loan(s) and b) provides Seller within seven (7) days from the date of such Notice ("Notice Period") with a letter of loan denial from a Lender based upon the Lender's customary and standard underwriting criteria ("Loan Denial Letter") stating the basis for the loan denial. The Loan Denial Letter and Lender issuing the Loan Denial Letter must meet all of the requirements set forth elsewhere in this Exhibit, including that the Loan Denial Letter be from an Approved Lender, if one is named in Section 2 above. Such Loan Denial Letter may be provided to Seller after the Financing Contingency Period has ended if the above-referenced seven (7) day period to provide the Loan Denial Letter falls outside of the Financing Contingency Period. Notwithstanding the above, the end of the Financing Contingency Period shall not limit Buyer's rights under the Appraisal Contingency section of this Agreement, provided that the Appraisal Contingency has not expired.

8. **Use of Approved Lender and Loan Denial Letter**. If there is an Approved Lender identified herein, then the Loan Denial Letter shall come from an Approved Lender. If the Approved Lender is a mortgage broker, the Loan Denial Letter can be from the mortgage broker or the mortgage lender with whom the mortgage broker placed the Loan(s). If Buyer is not required to apply for the Loan(s) with an Approved Lender, the Loan Denial Letter may be written by any Lender.

   Notwithstanding any provision to the contrary contained herein, the Loan Denial Letter must state the basis for the loan denial and may not be based solely upon one or more of the following: (a) Buyer lacking sufficient funds other than the amount of the Loan(s) to close; (b) Buyer not having leased or sold other real property (unless such a contingency is expressly provided for in this Agreement); (c) Buyer not having provided the lender(s) in a timely fashion with all information required by lender, including but not limited to, loan documentation, Official Wood Infestation Reports, structural letters, well tests, septic system certifications, flood plain certifications and any other similar information required by lender (hereinafter collectively "Required Information"); (d) Buyer making purchases that adversely affect Buyer's debt to income ratio; (e) the Property not appraising for at least the purchase price unless this Agreement is subject to an appraisal contingency and an appraisal meeting the requirements of this Agreement has been performed; or (f) the lender not having completed underwriting the loan request.

   Buyer may terminate this Agreement without penalty based upon an inability to obtain the Loan(s) only if Buyer fulfills all of the applicable requirements set forth in this Exhibit.

9. **Special Approval if Property is a Condominium or Subject to a Master Insurance Policy.** Notwithstanding any provision to the contrary contained herein, if the Property is a unit in a condominium or is covered under a fire and casualty insurance policy covering multiple attached residences, this Agreement is additionally contingent upon Buyer's Lender obtaining underwriting approval of such fire and casualty insurance policy and/or the development (hereinafter "Project Approval"). If an Approved Lender has been identified herein, the Lender under this section must be an Approved Lender. If at any time the Lender determines that the inability to obtain Project Approval is preventing a mortgage loan from being made, then Buyer shall have the right to terminate this Agreement without penalty and receive a full refund of all Earnest Money, provided that Buyer provides Seller with a letter from such Lender or Approved Lender, as the case may be, stating that the inability to obtain Project Approval is what is preventing a mortgage loan from being made to the Buyer. Such letter shall be provided to Seller not later than the date of Closing or within seven (7) days of the termination of the Agreement by Buyer, provided that the Notice of termination is given prior to Closing.

10. **Right of Seller to Request Evidence of Buyer's Ability to Close.** If the Financing Contingency ends without Buyer terminating this Agreement, Seller shall have the right, but not the obligation, to request that Buyer provide Seller with written evidence of Buyer's financial ability to purchase the Property ("Evidence"). A copy of a loan commitment from each institutional mortgage lender from whom Buyer is seeking mortgage financing to purchase the Property stating the type, amount and terms of the loan(s) and the conditions for funding the loan(s), shall be deemed sufficient Evidence. The provision of such Evidence is not a guarantee that the mortgage loan(s) will be funded or that Buyer will close on the purchase of the Property. Buyer shall have five (5) days from the date Seller delivers Notice to Buyer requesting such Evidence to produce the same. No request for such Evidence shall be made by Seller less than five (5) days from the date of Closing. It is intended that the Evidence Buyer produces shall be liberally interpreted, where possible, in favor of a finding that Buyer has the ability to close on the purchase of the Property.

11. **Seller's Right to Terminate.** In the event Buyer fails to provide Seller with the Evidence of Buyer's Ability to Close within the timeframe set forth above, Seller shall notify Buyer of the default and give Buyer two (2) days from the date of the delivery of the Notice to cure the same. If Buyer does not timely cure the default, Seller may terminate this Agreement within seven (7) days thereafter (or however many days are left until the Closing but excluding the day of Closing) due to Buyer's default upon Notice to Buyer. In the event Seller does not terminate this Agreement within that timeframe, the right to terminate on this basis shall be waived.

12. **Authorization of Buyer to Release Information to Seller and Brokers.** Buyer does hereby authorize Seller and the Brokers identified herein to communicate with the lenders with whom Buyer is working to determine and receive from said lenders any or all of the following information: (a) the status of the loan application; (b) Buyer's financial ability to obtain the Loan(s) or other loans for which Buyer has applied; (c) whether and when Buyer provided the lenders with Required Information; (d) whether and what conditions may remain to complete the loan application process and issue of a loan commitment; and (e) the basis for any Loan Denial Letter.

13. **Miscellaneous.** For the purposes of this Exhibit, the term "mortgage loan" shall refer to a secured lending transaction where the loan or promissory note is secured by a deed to secure debt on the Property. Whether such mortgage loan is a first or second mortgage loan is a reference to the legal priorities of the deeds to secure debt relative to each other and other liens and encumbrances.

dotloop signature verification: dtlp.us/XASR-dISz-CfzB
Authentisign ID: 5ABE8D28-6DC3-F111-A5A9-000D3A4FF82A


**14. Appraisal Contingency.** In addition to Buyer's other rights herein, this Agreement shall be subject to the following appraisal contingency. Buyer shall cause the lender to: (a) select an appraiser to perform one or more appraisals of the Property and (b) provide Seller with a copy of any appraisal that is for less than the purchase price of the Property. If any such appraisal is for less than the purchase price, Buyer shall, not later than by the end of the time period set forth in Section 4 above, have the right to request that Seller reduce the purchase price of the Property to a price not less than the appraised price by submitting to Seller an Amendment to Purchase Price (F713) ("ATPP") signed by Buyer along with a copy of the appraisal supporting the lower price. In the event that Buyer does not timely submit an ATPP to Seller, Buyer shall be deemed to have waived Buyer's right to do so and this Agreement shall no longer be subject to an appraisal contingency.

Seller shall, not later than three (3) days from the date of an ATPP is delivered to Seller (but not later than two (2) days prior to Closing), accept or reject the ATPP or seek to negotiate with Buyer a lesser reduction in the purchase price of the Property than what is reflected in the ATPP. If Seller timely signs and accepts the ATPP, then Buyer shall be required to close at the new purchase price, and, unless otherwise agreed to in writing by the parties, Buyer's Appraisal Contingency shall terminate. If, within the above timeframe, an ATPP has not been signed and accepted by the Buyer and Seller and timely delivered to create a legally enforceable amendment, Buyer shall have an additional three (3) days (but not later than one (1) day prior to Closing) to terminate this Agreement without penalty. If Buyer does not terminate the Agreement within this timeframe, Buyer's right to terminate due to the failure to agree to an ATPP shall be waived and Buyer shall close on the Property for the purchase price set forth in this Agreement. Nothing herein shall require Buyer to seek a reduction in the purchase price of the Property. If Buyer does not seek a reduction in the purchase price, Buyer shall be obligated to purchase the Property for the price agreed to by the parties in the Agreement.

| | |
|---|---|
| AuthentiSIGN LAQUANTIS A. HALL | S.Gregory Hays — dotloop verified 10/08/26 6:06 PM EDT NBN8-UKUS-1XJN-1ME3 |
| **1 Buyer's Signature** | **1 Seller's Signature** |
| **LAQUANTIS A. HALL** | **S.Gregory as Chp7 trustee for Bankkruptcy estate for Curtis Hinton** |
| Print or Type Name | Print or Type Name |
| **2 Buyer's Signature** | **2 Seller's Signature** |
| Print or Type Name | Print or Type Name |
| ☐ **Additional Signature Page (F267) is attached.** | ☐ **Additional Signature Page (F267) is attached.** |
| **Gloria A. Watson Realty** | **Keller Williams West Atlanta** |
| Buyer Brokerage Firm | Seller Brokerage Firm |
| AuthentiSIGN Gloria Watson | L.Knight — dotloop verified 10/08/26 5:02 PM EDT PUZK-CWG9-NR5F-KRQ1 |
| **Broker/Affiliated Licensee Signature** | **Broker/Affiliated Licensee Signature** |
| **Gloria Watson** | Lakisha Knight |
| Print or Type Name | Print or Type Name |
| **FCBOR** | Atlanta Realtors Association |
| REALTOR® Membership | REALTOR® Membership |

# CLOSING ATTORNEY ACTING AS HOLDER OF EARNEST MONEY EXHIBIT "C"

**[Closing Attorney must still consent to serve as Holder using F511]**

**2026 Printing**

This Exhibit is part of the Agreement with an Offer Date of 9/29/2026 for the purchase and sale of that certain property known as: 209 Kingscastle Drive ELLENWOOD, , Georgia 30294 ("Agreement").

1. **Closing Attorney Shall Act as Holder.** The Closing Attorney named in this Agreement shall be the Holder of the earnest money and other trust funds referenced in this Agreement subject to the Closing Attorney timely: a) agreeing to serve; b) signing the appropriate documents; and c) timely delivering the same to Buyer and Seller as more particularly described below.
2. **Buyer Must Timely Deliver Certain Documents to Closing Attorney Acting as Holder of Earnest Money.** When the Closing Attorney has been named as Holder in the Agreement, Buyer must deliver to Closing Attorney within two (2) business days from the Binding Agreement Date: a) the fully-signed and executed Agreement in its entirety ("Entire Contract"); and b) a copy or copies of the Escrow Agreement (F511) for the Closing Attorney to sign agreeing to become the Holder. Buyer must similarly deliver to Holder all amendments to the Entire Contract within two (2) business days of the date that the Amendment becomes binding.
3. **Closing Attorney Must Agree to Become Holder Within Five (5) Business Days of Receiving Entire Contract.** The Closing Attorney named as Holder shall not become the Holder unless within five (5) business days from the date that the Closing Attorney receives the Entire Contract, the Closing Attorney has: a) countersigned the Agreement of Closing Attorney to serve as Holder (GAR Form F511, and sometimes referred to as "Escrow Agreement") without change or modification so except for filling in the blanks contained therein; and b) delivered the same to Buyer and Seller. When this occurs, Closing Attorney's rights and duties as Holder and the timeframe for completing the same shall commence.
4. **Rights and Duties of Closing Attorney Acting as Holder.** Notwithstanding any provision to the contrary contained in the Agreement, Closing Attorney acting as Holder shall have all of the pre-printed rights and duties of Holder set forth in the GAR Purchase and Sale Agreement (a copy of which is incorporated herein by reference), regardless of whether such rights and duties are set forth in this Agreement. In the event of a conflict between this Agreement and the pre-printed right and duties of Holder set forth in the GAR Purchase and Sale Agreement, the latter shall control unless otherwise agreed to in writing by Buyer, Seller, and Holder. In the event the transaction does not close, Closing Attorney shall not have a right to deduct any of attorney's costs or fees pertaining to the Closing from the earnest money or other trust funds being held by Closing Attorney, except as may be provided elsewhere herein. Buyer and Seller acknowledge and agree that the fact that the closing attorney may represent a real estate brokerage firm or firms involved in the transaction or regularly close real estate transactions involving a particular broker or agent of the broker shall not prevent the closing attorney from fully performing its duties hereunder, including, but not limited to disbursing earnest money based upon a reasonable interpretation of this Agreement.
5. **Earnest Money Must Be Paid to Closing Attorney Acting as Holder by Wire Transfer.** Buyer shall be responsible for paying all earnest money and other Buyer trust funds to the Closing Attorney acting as Holder by wire transfer of immediately available funds or by such other method deemed acceptable and/or required by Closing Attorney, as the case may be.
6. **Failure of Closing Attorney to Become Holder.** If the Closing Attorney named as Holder has not become Holder because the Closing Attorney rejects being the Holder or fails to timely become Holder, then: a) the Alternate Holder named below, who must be a broker in this transaction, shall automatically become the Holder instead of the Closing Attorney; b) all parties consent to the earnest money being paid or transferred to the Alternate Holder; and c) all parties shall cooperate with one another to sign any documents required to accomplish the same. The signature of the Alternate Holder to the Agreement at the time it is first signed shall be deemed consent of the Alternate Holder to serve as Holder. The Alternate Holder's duties and the timeline for performing those duties shall commence when the Alternate Holder becomes the Holder.
7. **Alternate Holder.** The Buyer must immediately notify all parties if the Closing Attorney fails to become Holder. The Alternate Holder, who must be a broker in this transaction, shall be Keller Williams West Atlanta. In the event an Alternate Holder is not named, the Alternate Holder shall be the Buyer's Broker.
8. **Closing Attorney Holding Earnest Money in All-Cash Transaction.** In an all-cash transaction where the Closing Attorney is representing the Buyer or Seller, the Closing Attorney can hold the earnest money (and other trust funds), but in the event of a dispute between the parties regarding the disbursement of the funds, the Closing Attorney shall not disburse the funds based upon a reasonable interpretation of the Agreement. Instead and notwithstanding any provision to the contrary contained in this agreement, in the event of a dispute regarding the earnest money in an all-cash transaction where the Closing Attorney is representing the Buyer or Seller, the only remedy available to the Closing Attorney to resolve the dispute regarding the disbursement of earnest money shall be to interplead the funds into a court of competent jurisdiction.
9. **Notices To and From Holder.** The Notice procedures in the Agreement shall control with regard to all Notices to and from Holder. Holder's contact information is set forth in signature pages to this Agreement.
10. **Closing Attorney's Contact Information.** The Closing Attorney named below shall be the Holder in this transaction. If an individual attorney who works for a law firm is named as the Closing Attorney herein, all parties agree that the law firm shall technically be the Closing Attorney.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Gloria Watson IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.
Copyright© 2026 by Georgia Association of REALTORS®, Inc.

dotloop signature verification: dtlp.us/XASR-dISz-CfzB
Authentisign ID: 085E07C2-5A3C-F111-A5A9-000D3A4FF82A


Closing Attorney: LUEDER,LARKIN & HUNTER,LLC

Address: 3800 Camp Creek Parkway Building 1800, Suite 102
Atlanta, Georgia 30331

Phone Number: 770-727-6256

Fax Number: 770-727-6256

Email: campcreek@luederlaw.com

Buyer's Initials: LA

Seller's Initials: SGH 10/08/26 6:06 PM EDT dotloop verified

dotloop signature verification: dtlp.us/XASR-dISz-CfzB
Authentisign ID: 5ADE6968-53B3-F111-A5A9-000D3A4FF82A


# BUYER'S BROKER COMPENSATION EXHIBIT

## Exhibit "D"

Georgia REALTORS®

**2026 Printing**

(THIS EXHIBIT SHOULD NOT BE USED IF THE BROKER(S) COMPENSATION AND THE PARTY OR BROKER PAYING IT HAVE ALREADY BEEN AGREED TO IN A SEPARATE WRITTEN AGREEMENT AND IS NOT BEING MODIFIED)

This Exhibit is part of the Agreement with an Offer Date of 9/29/2026 for the purchase and sale of that certain Property known as: 209 Kingscastle Drive ELLENWOOD, Georgia ("Agreement").

For and in consideration of $10.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned do hereby agree as follows:

1. **Compensation Being Offered to Buyer's Broker.** The compensation of the undersigned Buyer's Broker for professional brokerage services ("Compensation") provided in the above-referenced transaction is set forth below and shall be paid by the following party or the Broker working with or representing such party:
   - **A. Compensation Paid by Seller to Buyer's Broker:** The Compensation to be paid by the Seller to Buyer's Broker in this transaction shall be as set forth below:
     - ☐ ________ percent (____%) of the sales price;
     - ☐ $________;
     - ☐ (other)________
   - **B. Compensation Shared by Seller's Broker with Buyer's Broker:** Such Compensation is a portion of the Compensation paid by Seller to Seller's Broker pursuant to a separate written agreement between Seller and Seller's Broker. The Compensation paid by Seller's Broker to Buyer's Broker in this transaction shall be as set forth below:
     - ☒ Two percent (2 %) of the sales price;
     - ☐ $________;
     - ☐ (other)________
2. **General.**
   - **A.** Neither Broker shall have a claim for Compensation against the other in the event the closing does not occur.
   - **B.** Any licensee signing this Buyer's Broker Compensation Exhibit ("Compensation Exhibit") on behalf of their Broker warrants that they have full authority to sign on behalf of and bind the Broker to this Compensation Exhibit.
   - **C.** Once this Compensation Exhibit is initialed, it cannot be further modified (even by special stipulation or a later amendment to this Exhibit) without the express written consent of the Broker(s) whose Compensation is set forth or shared herein and any such modification shall be null and void without the affected Broker's written consent.
   - **D.** The Brokers referenced herein are express third-party beneficiaries of this Agreement. The rights to Compensation herein shall survive the Closing, and Brokers shall have all remedies available at law or in equity, in the event Broker is not timely paid.

**SPECIAL STIPULATIONS**: The following Special Stipulations are made a part of this Agreement.

☐ Additional Special Stipulations (F246) are attached.

[INITIALS ON FOLLOWING PAGE]

**THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Gloria Watson IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.**
**Copyright© 2026 by Georgia Association of REALTORS®, Inc.**

CAH

**1 Buyer's Initials**

09/29/2026

Date

SGH 10/08/26 6:06 PM EDT dotloop verified

**1 Seller's Initials**

10/08/2026

Date

**2 Buyer's Initials**

Date

**2 Seller's Initials**

Date

GAW

**3 Buyer's Broker's Initials**

Date

LK 10/08/26 6:02 PM EDT dotloop verified

**3 Seller's Broker's Initials**

10/08/2026

Date

# TEMPORARY OCCUPANCY AGREEMENT FOR BUYER PRIOR TO CLOSING EXHIBIT "E"

Georgia REALTORS®

**2026 Printing**

This Exhibit is part of the Agreement with an Offer Date of **9/29/2026** for the purchase and sale of that certain Property known as: **209 Kingscastle Drive**, **ELLENWOOD,**, Georgia **30294** by and between **LAQUANTIS A. HALL** ("Buyer") and **S. GREGORY AS CHP7 TRUSTEE FOR BANKRUPTCY ESTATE FOR CURTIS HINTON** ("Seller").

**1.** Seller shall give Buyer occupancy of Property on the date of **9/21/2026** at **9** o'clock ☒ a.m. or ☐ p.m. (Seller has confirmed that if Property is located in a limited access community that Buyer shall be given access to Property prior to Closing.)

**2.** Buyer shall pay Seller as compensation for the use of Property the sum of $**SEE SP. STIP.** per day ($________ per month) computed on a thirty (30) day basis, payable in advance, and thereafter on the ________ day of each month until such time as the closing of the sale of the Property to Buyer is consummated. Buyer shall pay said rental to **CURTIS HINTON** at the following address: **209 KINGCASTLE DR.,ELLENWOOD , GA. 30294**. Buyer acknowledges and agrees that no part of the rental shall be applied to the purchase price of the Property. Said rental shall be prorated at time of closing, at which time any excess rental paid shall be returned to Buyer.

**3.** Buyer has paid to Seller security deposit of $____________, by a method acceptable to Seller (the receipt of which is hereby acknowledged by Seller). The security deposit shall be deposited in Seller's bank account within three (3) banking days of receipt, with Seller retaining any interest thereon. If the Purchase and Sale Agreement to which this Agreement is an exhibit, closes in accordance with its terms, the security deposit shall be credited to Buyer at the time the sale is consummated. In the event that the sale is not consummated due to the default of Buyer, Seller shall be entitled to deduct from the security deposit any unpaid rental payments, any accumulated late charges or returned check charges, and the expense of repairing any damage to Property caused by Buyer, normal wear and tear excepted. In the event of deductions from the security deposit, Seller shall provide Buyer with a written statement identifying the exact reasons for the retention thereof including a comprehensive list of damages, within 30 days after Seller obtains possession of the Property. In the event Seller, his or her spouse and his or her minor children collectively own more than ten rental units, Seller shall additionally comply with the requirements set forth in O.C.G.A §§ 44-7-31, 44-7-32, 44-7-33 and 44-7-35.

**4.** Buyer will accept Property in its present condition, except as provided in the Agreement and/or as follows:
**TERMS OF THE PURCHASE AND SALES AGREEMENT.**

**5.** Buyer, Buyer's inspectors, or representatives, at Buyer's expense and at reasonable times during normal business hours, shall have the right and responsibility to enter upon Property for the purpose of making a diligent, prudent and competent inspection (including conducting the final walk through), by examining, testing, and surveying Property. Buyer agrees to assume all responsibility for the acts of himself, his inspectors, and representatives in exercising his rights under this paragraph and agrees to hold Seller, Broker and Broker's Affiliated Licensees harmless for any damages or injuries resulting therefrom. The inspection of Property shall include, but is not limited to: termites, wood-destroying organisms; all appliances remaining with Property, heating and air conditioning systems; plumbing (including, without limitation, sewer/septic and water/well systems, pool and spa); electrical systems; roof, gutters, structural components, foundation, fireplace(s) and chimney(s); drainage conditions or evidence of excessive moisture adversely affecting the structure(s); excessive levels (as defined by the Environmental Protection Agency) of radon, toxic wastes, hazardous substances (including, but not limited to: lead, mold, asbestos and urea-formaldehyde), or other undesirable substances; any other condition or circumstance which may adversely affect Property, and any personal property described in this Agreement. Said inspection(s) are to be completed prior to occupancy, and Buyer must object in writing at the time of occupancy to any defects in Property or waive any further claim in relation thereto. Commencing on the date of occupancy, Buyer shall maintain said Property in good working order, shall keep the roof watertight and shall properly maintain the grounds of Property. The responsibility of Seller for Property shall end upon occupancy of Property by Buyer.

**6.** Buyer shall make no alterations, repairs or improvements to Property without first obtaining the prior written consent of Seller. If Seller so consents, Buyer shall promptly pay all third parties for labor, services and materials performed or supplied in making said alterations, repairs or improvements. Buyer shall furnish Seller with proof that all said labor, services and materials have been paid for and shall indemnify and hold harmless Seller against, and from, any and all liens which may be asserted or filed against the Property relating to the making of said alterations, repairs or improvements.

Notwithstanding any other provision in the Agreement to the contrary, in the event that the sale is not consummated for any reason, any alterations, repairs or improvements made pursuant to this paragraph shall be the sole property of Seller, and Buyer: (a) shall not be entitled to be reimbursed or compensated for making or having made any of said alterations, repairs or improvements; and (b) waives any right to assert or file any lien against Property.

**7.** In the event that Buyer makes any alterations, repairs or improvements to Property in accordance with paragraph 6 hereof, Buyer agrees to indemnify and hold harmless Seller, Seller's Broker, Buyer's Broker and their Affiliated Licensees from any claim or loss, including reasonable attorney's fees, relating to personal injuries or property damage caused by or arising out of the making of said alterations, repairs or improvements.

**THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Gloria Watson IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.**
**Copyright© 2026 by Georgia Association of REALTORS®, Inc.**

**8.** Buyer shall have all utility records changed over to Buyer's name and shall pay all utilities, services and fees, commencing on date of occupancy.

**9.** Seller shall, at Seller's expense, retain fire and extended insurance coverage on Property until the date of closing. Buyer acknowledges that such insurance coverage does not cover Buyer's personal possessions and that Buyer shall bear the risk of loss on Buyer's personal property or for injuries sustained should Property be destroyed by fire or any act of nature during the time that the Buyer is in possession.

**10.** Buyer acknowledges that this Exhibit merely grants Buyer a right to occupy Property prior to the consummation of the sale so long as Buyer is not in default under the terms of the Agreement and this Exhibit. In the event the Agreement is terminated pursuant to paragraph 11 of this Exhibit, Buyer shall be deemed a tenant at sufferance, shall immediately vacate Property, shall return all keys to Seller, and shall pay all costs of any legal action instituted by Seller to enforce the terms of this Exhibit, including reasonable attorney's fees. If Buyer does not immediately vacate, Buyer shall pay Seller a daily hold-over fee of $ 169.00 from the date the Agreement is terminated until Buyer vacates and returns possession of Property to Seller.

**11.** If any payments are required by this Exhibit are not actually received by Seller or Seller's Broker on the due date, Seller shall give Buyer written notice of the default, and Buyer shall have five (5) days from the date of the notice to deliver the payment and late fee to Seller, or Seller shall have the right to terminate the Agreement by giving Buyer written notice thereof. If any rental payments required by this Exhibit are not actually received by Seller or Seller's Broker on the due date, Buyer shall pay to Seller an additional amount equal to N/A percent (%) of the payment due as additional rent. If Buyer fails to perform any obligation required by this Exhibit other than the payment of rental, Seller shall give Buyer written notice of the default, and Buyer shall have ten (10) days from the date of the notice to perform said obligation, or Seller shall have the right to terminate the Agreement by giving Buyer written notice thereof.

**12.** Buyer agrees to indemnify and hold Seller harmless from any claim or loss which results from the actions of Buyer or anyone else entering Property while Property is occupied by Buyer under this Exhibit.

**13.** No pets shall be allowed unless the exhibit entitled "Pet Exhibit" is attached. If such exhibit is attached hereto, same is incorporated by reference herein. Notwithstanding any provision contained in said Pet Exhibit, if closing does not take place, Buyer agrees to have Property treated for ticks and fleas by a professional exterminator upon moving out.

**14.** In the event that the sale is not consummated for any reason, Buyer shall be liable for the expense of repairing any damage to Property caused by Buyer, normal wear and tear excepted.

**15.** Seller shall remove Seller's personal property from the Property prior to the occupancy of the Property by Buyer, except for those items that are to remain with the Property, as set forth in the Fixtures Checklist attached hereto and incorporated herein.

**16.** At the time of Buyer's occupancy, to the extent allowed by a community association, Seller shall provide Buyer with one set of keys, door openers, fobs, access cards, codes and other similar equipment needed to access the Property. Seller shall also cooperate with the community association to provide Buyer with access to the community and community amenities. At time of Closing, to the extent allowed by a community association, Seller shall turn over all remaining keys, door openers, fobs, access cards, codes and other similar equipment needed to access the Property, the community and community amenities in Seller's possession to Buyer. In the event the sale is not consummated for any reason, Buyer will return all keys, door openers, fobs, codes and other similar equipment used to access the Property, the community and community amenities.

**17.** In the event there is a conflict between the terms and conditions of the Agreement and this Exhibit, the terms and conditions contained in this Exhibit shall prevail.

**SPECIAL STIPULATIONS:**

BUYER AGREES TO PAY THE SELLER A FLAT FEE OF $1000.OO RENTAL FOR POSSESSION UNTIL 11/04/2026.

☐ **Additional Special Stipulations (F246) are attached.**

Buyer's Initials: LA

Seller's Initials: SGH 10/08/26 6:06 PM EDT dotloop verified

# EXHIBIT "F"

## SPECIAL STIPULATIONS

*Property: 209 Kingscastle Drive, Ellenwood, Georgia 30294. Buyer: LaQuantis A. Hall. Seller: S. Gregory Hays, as Chapter 7 Trustee for the bankruptcy estate of Curtis Hinton (Case No. 26-57158-JWC).*

1. Buyer acknowledges and understands that the offer contemplated by this Agreement is subject to higher and better offers.

2. Seller shall have no duty or obligation to close the sale, as contemplated by this Agreement, until: (a) the entry of an order on the docket in the Chapter 7 bankruptcy case of Curtis Hinton (Case No. 26-57158-JWC) by the United States Bankruptcy Court, Northern District of Georgia, Atlanta Division (the **"Bankruptcy Court"**) approving the sale of the interest in the bankruptcy estate of Curtis Hinton (Case No. 26-57158-JWC) (the **"Estate"**) in the Property to Buyer, or substitute party (the **"Approval Order"**); and (b) the Approval Order becoming a Final Order. As used in this Agreement or the exhibits hereto, **"Final Order"** means an order of the Bankruptcy Court (1) which contains language to the effect that under Rule 6004(h) of the Bankruptcy Rules, the order shall be effective and enforceable upon entry, or (2) if the order does not contain such language, an order (i) for which any appeal that has been taken has been finally determined or dismissed, or (ii) for which the time for appeal has expired and no appeal had been filed timely.

3. In the event of any material default of the terms of this Agreement, Buyer and Seller shall have the following as their respective sole remedies:

   a. In the event of an uncured material default by Buyer, Seller shall have the right to terminate this Agreement and retain the Earnest Money.

   b. In the event of an uncured material default by Seller, Buyer shall have the right to terminate this Agreement and recover the Earnest Money.

4. Buyer and Seller agree that the Property is being sold "As is, Where is" (subject to any Due Diligence Period) and that Seller is not making and has not made any representations or warranties or any present or future covenants regarding the quality of title of the Estate in the Property. At the closing of the sale contemplated by this Agreement, Seller will convey the Estate's interest in the Property via trustee deed.

5. If this Agreement is not earlier terminated, then in the event that the Bankruptcy Court (1) denies approval of this Agreement, or (2) fails to issue an Approval Order, then, unless otherwise agreed to by Buyer and Seller in writing, this Agreement shall terminate and be of no further force or effect and the parties will be restored to their respective factual and legal positions which existed immediately prior to execution of this Agreement.

6. Buyer acknowledges and understands that Seller is a bankruptcy trustee, has never seen the Property, has never visited the Property, and has no personal knowledge or information about the Property.

dotloop signature verification: dtlp.us/XASR-dISz-CfzB
Authentisign ID: 5A0E4DD8-53C3-F111-BE5B-000D3A4FF82A


7. In Section A. 4. of the Agreement, the Closing Date and Possession shall be November 6, 2026.

8. In Section A. 5. of the Agreement, the Closing Attorney shall be Lueder, Larkin & Hunter, LLC. In Section A. 6. of the Agreement, the Holder shall be Lueder, Larkin & Hunter, LLC, as Closing Attorney, and the Closing Attorney Acting as Holder of Earnest Money Exhibit (F510) (Exhibit "C") and the Agreement of Closing Attorney to Serve as Holder of Earnest Money (F511) are made a part of this Agreement.

9. In Section A. 11. of the Agreement, the Time Limit of the Offer shall be 5:00 o'clock p.m. on the date October 8, 2026.

10. In Section B. 1.a. of the Agreement, the words "limited warranty" are deleted from the first sentence of that section, and the word "trustee" is substituted in their place.

11. Section B. 4.b. of the Agreement is hereby deleted from the Agreement.

12. Section B. 4.c. of the Agreement is hereby deleted from the Agreement.

13. Section B. 5. of the Agreement is hereby deleted from the Agreement.

14. Section B. 8.f. of the Agreement is hereby deleted from the Agreement.

15. Section B. 8.g. of the Agreement is hereby deleted from the Agreement.

16. Section C. 2. of the Agreement is hereby deleted from the Agreement.

17. The last sentence of Section C. 3. of the Agreement is hereby deleted from the Agreement.

18. S. Gregory Hays, as Chapter 7 Trustee for the bankruptcy estate of Curtis Hinton (Case No. 26-57158-JWC), shall be the Seller in the Agreement and not S. Gregory Hays in his individual capacity. All references in the Agreement and in any exhibit or amendment thereto to "S. Gregory as Chp7 Trustee for Bankruptcy Estate for Curtis Hinton," or any similar designation, shall mean S. Gregory Hays, as Chapter 7 Trustee for the bankruptcy estate of Curtis Hinton (Case No. 26-57158-JWC).

19. Notwithstanding anything to the contrary in the Temporary Occupancy Agreement for Buyer Prior to Closing Exhibit (Exhibit "E"), all rent, fees, and other sums payable by Buyer for the use or occupancy of the Property shall be paid to Seller, S. Gregory Hays, as Chapter 7 Trustee, and not to Curtis Hinton or any other person. Buyer's occupancy of the Property prior to Closing is at Buyer's sole risk, and Buyer acknowledges that Seller has no obligation to close unless and until the conditions set forth in paragraph 2 above have been satisfied.

dotloop signature verification: dtlp.us/XASR-dISz-CfzB
Authentisign ID: 5A0E4DD8-53C3-F111-BE5B-000D3A4FF82A


20. Notwithstanding anything to the contrary in the Agreement or in any exhibit or amendment thereto, including, without limitation, Amendment #1 (Amendment to Authorize Buyer to Make Repairs and/or Improvements Prior to Closing (F725)) and Exhibit "E," the denial of approval of this Agreement by the Bankruptcy Court, or the failure of the Bankruptcy Court to issue an Approval Order, shall not constitute Seller's inability, failure, or refusal to perform, and Seller shall have no obligation to reimburse or compensate Buyer for any repairs, alterations, or improvements made to the Property.

| | |
|---|---|
| AuthentiSIGN LAQUANTIS A. HALL 10/08/26 | S. Gregory Hays — dotloop verified 10/08/26 6:06 PM EDT 73CN-LVUR-TTL6-OAGM |
| Buyer | Seller |
| Gloria Watson — dotloop verified 10/08/26 4:01 PM EDT FSEU-6MHZ-KWD2-IBJA | L. Knight — dotloop verified 10/08/26 5:02 PM EDT FB3Q-J7K6-NF4O-DSAU |
| Buyer's Agent | Listing Agent |

**CERTIFICATE OF SERVICE**

This is to certify that I, Michael J. Bargar, am over the age of 18 and that on this day I have caused to be served a copy of the foregoing *Trustee's Motion for Authority to (A) Sell Property of the Bankruptcy Estate Free and Clear of All Liens, Interests, and Encumbrances; (B) Disburse Certain Proceeds at Closing; and (C) Surcharge Collateral of Georgia Department of Revenue, United Auto Acceptance Corp., and Danco Financial* by depositing in the United States mail a copy of same in a properly addressed envelope with adequate postage affixed thereon to assure delivery by first class United States Mail and/or certified mail, as indicated, to the following persons at the addresses stated:

**First Class Mail**
Office of the United States Trustee
362 Richard B. Russell Bldg.
75 Ted Turner Drive, SW
Atlanta, GA 30303

**First Class Mail**
Curtis Walter Hinton, Jr.
209 Kingscastle Drive
Ellenwood, GA 30294

**First Class Mail**
Milton D. Jones, Attorney
P.O. Box 533
Lovejoy, GA 30250

**First Class Mail**
Milton D. Jones, Attorney
12252 Styron Drive
Hampton, GA 30228

**First Class Mail**
S. Gregory Hays, Chapter 7 Trustee
Hays Financial Consulting, LLC
Suite 555
2964 Peachtree Road
Atlanta, GA 30305

**First Class Mail**
Lakisha Knight
Keller Williams West Atlanta
2700 Cumberland Pkwy., Suite 400
Atlanta, GA 30339

**First Class Mail**
LaQuantis A. Hall
c/o Gloria Watson
Gloria A. Watson Realty
115 Millhaven Landing
Fayetteville, GA 30215

**First Class Mail**
Lueder, Larkin & Hunter, LLC
c/o Kimberly L. Mays
3800 Camp Creek Parkway
Building 1800, Suite 124
Atlanta, Georgia 30331

**First Class Mail**
Farmers and Merchants Bank
2140 Old Covington Road
Conyers, GA 30013

**First Class Mail**
Farmers and Merchants Bank
c/o Karl E. Osmus
PO Box 200
Thomasville, GA 31799-0200

**First Class Mail**
United Auto Acceptance Corp.
c/o Jones, Robin & Robin, P.C.
P.O. Box 888
Metter, GA 30439

**First Class Mail**
Mary Beth Parker
Jones, Robin & Robin, P.C.
315 Cedar Street
Metter, GA 30439

**First Class Mail**
Danco Financial Services LLC
c/o Brian Gardiner
5604 Wendy Bagwell PKWY, Suite 923
Hiram, GA 30141

**First Class Mail**
Danco Financial Services LLC
510 Veterans Memorial HWY
Mableton, GA 30126

**First Class Mail**
Wes Dunlap
c/o Danco Financial
Dunlap & Gardiner LLP
5604 Wendy Bagwell PKWY Ste 923
Hiram, Georgia 30141

**First Class Mail**
AICA Orthopedics PC
c/o Francis Acquah
2253 Northwest Pkwy SE
Marietta, GA 30067

**First Class Mail**
AICA Orthopedics PC
c/o Francis Acquah
PO BOX 674508
Marietta, GA 30006

**First Class Mail**
AICA Orthopedics PC
c/o TRUE Space, Inc.
2400 Herodian Way SE, Ste 224
Smyrna, GA 30080

**First Class Mail**
Henry County Tax Commissioner
c/o Michael C. Harris
140 Henry Parkway
McDonough, GA 30253

**First Class Mail**
Henry County Tax Commissioner
c/o Michael C. Harris
164 Burke Street
Stockbridge, GA 30281

**First Class Mail**
Georgia Department of Revenue
Bankruptcy Section
2595 Century Parkway, NE, Suite 339
Atlanta, GA 30345-3173

**First Class Mail**
Georgia Department of Revenue
State of Georgia Revenue Commissioner
1800 Century Boulevard
Suite 15300
Atlanta, Georgia 30345

**First Class Mail**
Georgia Department of Revenue Compliance Division
ARCS - Bankruptcy
1800 Century Blvd NE, Suite 9100
Atlanta, GA 30345-3202

**First Class Mail**
Office of the Attorney General, State of Georgia
40 Capitol Square SW
Atlanta, Georgia 30334

**First Class Mail**
Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 7346
Philadelphia, PA 19101-7346

**First Class Mail**
Internal Revenue Service
Lisa D. Smith
Bankruptcy Specialist
401 W Peachtree St., NW, M/S 334-D
Atlanta, GA 30308-3539

**First Class Mail**
United States Attorney
Northern District of Georgia
Attn: Civil Process Clerk
75 Ted Turner Drive, SW, Suite 600
Atlanta, GA 30303]

**First Class Mail**
United States Attorney
600 Russell B. Russell Building
75 Ted Turner Drive, S.W.
Atlanta, Georgia 30303-3309

**First Class Mail**
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**First Class Mail**
Department of Justice, Tax Division
Civil Trial Section, Southern Region
P. O. Box 14198
Ben Franklin Station
Washington, D. C. 20044

**First Class Mail**
Internal Revenue Service
401 W. Peachtree Street, N.W.
Stop 334-D
Atlanta, GA 30308

This is to certify further that I have this day electronically filed the foregoing *Trustee's Motion for Authority to (A) Sell Property of the Bankruptcy Estate Free and Clear of All Liens, Interests, and Encumbrances; (B) Disburse Certain Proceeds at Closing; and (C) Surcharge Collateral of Georgia Department of Revenue, United Auto Acceptance Corp., and Danco Financial* using the Bankruptcy Court's Electronic Case Filing program, which sends a notice of this document and an accompanying link to this document to the following parties who have appeared in this case under the Bankruptcy Court's Electronic Case Filing program

S. Gregory Hays
ghays@haysconsulting.net, saskue@haysconsulting.net;GA32@ecfcbis.com

Milton D. Jones on behalf of Debtor Curtis Walter Hinton, Jr
miltondjonesatty@gmail.com, MiltonDJonesAttorney@jubileebk.net

Office of the United States Trustee
ustpregion21.at.ecf@usdoj.gov

Karl E. Osmus on behalf of Creditor Farmers and Merchants Bank
karlosmus@gmail.com, kbloodworth@bellsouth.net

This 9th day of October, 2026.

*/s/ Michael J. Bargar*
Michael J. Bargar
Georgia Bar No. 645709